**NORTHWEST POWER PRODUCTS, INC., Plaintiff-Appellant,**

v.

**OMARK INDUSTRIES, INC., Bob Wooten, and Bosco Fastening Service Center, Inc., Defendants-Appellees.**

**No. 77–1976.**

United States Court of Appeals, Fifth Circuit.

July 10, 1978.

Rehearing and Rehearing En Banc Denied Aug. 24, 1978.

---

Jack N. Price, Austin, Tex., Edward S. Koppman, Vernon O. Teofan, Dallas, Tex., for plaintiff-appellant.

Stephen L. Elliott, Dallas, Tex., for Bosco Fastening Service Center, Inc.

Marvin S. Sloman, Phillip N. Smith, Jr., Dallas, Tex., for Bob Wooten.

Jerry L. Buchmeyer, Timothy R. McCormick, Dallas, Tex., for Omark Industries.

Before THORNBERRY, RONEY and HILL, Circuit Judges.

RONEY, Circuit Judge:

Omark Industries, Inc. terminated Northwest Power Products, Inc. as a distributor of Omark powder actuated tools (PAT) and supplies. Northwest brought this treble damage action under the Sherman Act, 15 U.S.C.A. § 1, against Omark; the new distributor, Bosco Fastening Service Center, Inc.; and Northwest's former sales manager, Bob Wooten, who led a contingent of Northwest employees who defected to Bosco. Northwest alleges the defendants conspired both to strip it of its distributorship and to deprive it of its customers by tortious and unfair means. The district court granted summary judgment for the defendants.

The plaintiff rests its case on a slender line of decisions beginning with *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.*, 57 F.2d 96 (1st Cir.), *cert. denied*, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932), which held somewhat similar conduct to be a *per se* violation of the antitrust laws. Because we reject the *Pick-Barth* teaching and agree with defendants that the holding of *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975), largely controls this case, we affirm the judgment of the district court.

I. *Facts*

On appeal from a grant of summary judgment, the facts are to be viewed in the light most favorable to the nonmoving party. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Gauck v. Meleski*, 346 F.2d 433, 436 (5th Cir. 1965).

The market relevant here is the distribution and servicing of powder actuated tools and supplies for the construction industry in the Dallas-Fort Worth area. The tools fire nail-type fasteners for holding objects to masonry. In that market, Northwest was number two, with an 18–20 percent share, and ranked ahead of eight smaller distributors. Another Omark distributor, McLeroy Fasteners, accounted for two percent. Bosco, a sizeable retailer of construction supplies, sold some powder actuated tool products, but did not act as a distributor. Its sales at retail amounted to less than one-tenth of one percent of the market. Omark, ranking number two in the nation in the manufacture of PATs with a 25 percent market share, had engaged in some local distribution, and, at the time of the termination, still sold to national construction firms operating in Dallas. None of the depositions or affidavits offered in response to the motion for summary judgment, however, quantify those sales.

Omark grew dissatisfied with Northwest, thought its financial footing was unsound, and refused to supply it on other than a

C.O.D. basis. Perceiving the problem to be Northwest's president, Raymond McElroy, Omark secretly began negotiations with sales manager Wooten in an attempt to channel its business through an organization Wooten would head. Three Omark representatives then confronted McElroy, and told him that if he did not turn the management of Northwest over to Wooten then Wooten would leave and Omark would terminate Northwest. McElroy refused to comply. He fired Wooten. At Omark's suggestion, Bosco then hired Wooten to open a new PAT distributorship. Omark refused to supply Northwest further, and entered into a distributorship arrangement with Bosco. Bosco hired away Northwest's two other salesmen and a Northwest secretary, who took with her a valuable customer list.

Northwest, relying on Omark inventory and new PAT supplies furnished by Ramset and Diamond, continued in business. To eliminate Northwest from the market, agents of Omark and Bosco made false and disparaging remarks to Northwest customers. These remarks included statements that Northwest did not have the funds to buy Omark products, that Northwest would shortly be bankrupt, and later that Northwest was out of business, could not supply PAT products, and was now one and the same as Bosco.

At the time of summary judgment, Bosco had gained 11.5 percent of the local market, while Northwest's share had plummeted to two percent.

## II. *Pick-Barth*

■ A supplier may switch dealers and conspire with a new dealer to take the place of an established one. Without more, the antitrust laws do not stand in their way. *Burdett Sound, Inc.,* 515 F.2d at 1248–1249.

Plaintiff argues that Northwest distributed brands of PAT other than Omark, that the defendants conspired to use *unfair means* to eliminate Northwest as a competitor, and this action brings the defendants' conduct within the prohibition of the Sherman Act. The types of unfair competition assertedly employed by the defendants include (1) employee disloyalty, (2) misappropriation of a "trade secret" customer list, and (3) trade disparagement.

The first court to hold that a conspiracy to eliminate a competitor by unfair means violates the Sherman Act was the First Circuit in *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir.), *cert. denied,* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). The defendant, Pick-Barth, was a dominant factor in the national market for kitchen equipment and utensils. Pick-Barth's trade in the New England states, however, was limited. To break into that market, Pick-Barth hired away the plaintiff's employees and wrongfully obtained its customer list. The First Circuit, reversing a jury verdict that no unreasonable restraint of trade resulted, held that the intent to eliminate a competitor by unlawful or unfair competition violated the Act. A later case before the same court characterized the offense as *per se. Atlantic Heel Co. v. Allied Heel Co.,* 284 F.2d 879 (1st Cir. 1960) (two judges concurring in result only). In its most recent consideration, the First Circuit limited *Pick-Barth* and *Allied Heel* to what it perceived to be their facts, but did not overrule them. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974).

One other circuit court has recognized a *Pick-Barth* cause of action under the Sherman Act, *Perryton Wholesale, Inc. v. Pioneer Distributing Co.,* 353 F.2d 618 (10th Cir. 1965), *cert. denied,* 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966). That decision did not use *per se* language. One district court, however, has expressly applied a *per se* test, holding no anticompetitive effect need be shown. *Albert Sauter Co. v. Richard S. Sauter Co.,* 368 F.Supp. 501, 512–514 (E.D.Pa.1973) (verdict for plaintiff). Other courts have allowed trial of issues framed along the lines of the *Pick-Barth* theory of liability. *See Snyder v. Howard Johnson's Motor Lodges, Inc.,* 412 F.Supp. 724, 729 (S.D.Ill.1976) (denied summary judgment); *Tower Tire & Auto Center, Inc. v. Atlantic Richfield Co.,* 392

F.Supp. 1098 (S.D.Tex.1975) (denied summary judgment); *Mr. Hanger, Inc. v. Rizzuto,* 410 F.Supp. 1158 (S.D.N.Y.1975) (denied motion to dismiss for lack of jurisdiction); *Vogue Instrument Corp. v. Lem Instruments Corp.,* 40 F.R.D. 497 (S.D.N.Y. 1966) (denied summary judgment).

Our own decisions have never expressly considered *Pick-Barth. See Southland Reship, Inc. v. Flegel,* 534 F.2d 639, 643 (5th Cir. 1973). In *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.,* 383 F.2d 97 (5th Cir. 1967), *cert. denied,* 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968), we concluded that a case for the jury existed when a supplier enticed plaintiff distributor's employees into forming a new distribution organization for the supplier who then raised his prices to the plaintiff. In *Burdett Sound, Inc.,* however, without mentioning *Cherokee,* we rejected the theory that an allegation of unfair trade practices in the distributor substitution context could resist a motion for summary judgment, reasoning that "attempts to drive another competitor out of business" did not apply to substitutions. 515 F.2d at 1248. *See also Craig v. Sun Oil Co.,* 515 F.2d 221 (10th Cir. 1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). By examination of the original *Cherokee Laboratories, Inc.* and *Burdett Sound, Inc.* briefs, we have ascertained that in both cases the plaintiff relied on cases from the *Pick-Barth* line, but neither published opinion cites them.

This case is different from *Burdett Sound, Inc.* in some respects. Here the acts of unfair competition were not only designed to switch customers from one distributor to another, but they were also calculated to protect Omark from the new Ramset and Diamond brands carried by Northwest. *Burdett Sound, Inc.* only addressed conduct designed to lessen intrabrand competition. Here interbrand competition is also at stake, and interbrand competition is the "primary concern of antitrust law." *Continental T.V., Inc. v. GTE Sylvania, Inc.* 433 U.S. 36, 52 n.19, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

*Cherokee Laboratories, Inc.* was also an interbrand case. While that provides some basis for distinguishing the two cases, in view of this Court's prior failure to address squarely the *per se* issue raised by the plaintiff, we will confront that question first, and then, rejecting the *per se* rule, turn to consideration of whether the facts here can establish an antitrust violation under the rule of reason.

### III. *A Per Se Rule?*

The brief language of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C.A. § 1. The courts have looked to the "rule of reason" in giving substance to that terse wording, and examined the purpose, market power, and anticompetitive effect of the restraints before them. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Union Circulation Co. v. FTC,* 241 F.2d 652, 656 (2d Cir. 1957). Rule of reason analysis, however, is time-consuming and gives little guidance to businessmen engaged in planning a new transaction. To overcome those difficulties, the Supreme Court has preferred to map out areas of *"per se"* illegality, business practices which have such a "pernicious effect on competition and lack . . . any redeeming virtue" that they are condemned without inquiry into the nature of their impact on a particular market. *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *see Continental T.V., Inc.,* 433 U.S. at 50, 97 S.Ct. 2549 (1977).

The decisions applying the *Pick-Barth* rule as a *per se* offense have not closely analyzed the question of whether a conspiracy to eliminate a competitor by unfair means is the kind of conduct so contrary to the purposes of the Sherman Act that it deserves *per se* treatment. *See Atlantic Heel Co.,* 284 F.2d at 884. The conclusion is

stated rather than reached. The usual assumption is that a *per se* rule would grow out of a history of rule of reason cases all arriving at the same verdict. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Kentucky Fried Chicken, Inc. v. Diversified Packaging, Inc.*, 549 F.2d 368, 379 (5th Cir. 1977). The *Pick-Barth* jurisprudence reverses the order. The early cases apply a *per se* test, but the later cases resort to an approach which more closely resembles the rule of reason. Significantly, several of the most recent cases reject the *Pick-Barth per se* rule altogether. *Redwing Carriers v. McKenzie Tank Lines, Inc.*, 443 F.Supp. 639 (N.D.Fla.1977) (notice of appeal filed Fifth Circuit, No. 78–1362); *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.*, 430 F.Supp. 1234, 1241 (N.D.Iowa 1977); *Associated Radio Service Co. v. Page Airways*, 414 F.Supp. 1088, 1091–1094 (N.D.Tex.1976) (notice of appeal from subsequent order filed Fifth Circuit, No. 78–1159); *Mar Food Corp. v. Doane*, 405 F.Supp. 730 (N.D.Ill. 1975) (McLaren, D. J.); *Southland Reship, Inc. v. Flegel*, 401 F.Supp. 339, 347 (N.D.Ga. 1975) (dictum); *see du Pont Walston, Inc. v. E. F. Hutton & Co.*, 368 F.Supp. 306 (S.D. Fla.1973).

Scholarly analysis has also found little merit in the *Pick-Barth* doctrine. Yoerg, *Should a Trade Secrets Misappropriation Claim Lie in a Procrustean Antitrust Bed?*, 22 Antitrust Bull. 1 (1977); Boone, *Single-Corporation Competitive Torts and the Sherman Act*, 2 Ga.L.Rev. 372 (1968); Comment, *A Reexamination of Pick-Barth Per Se Illegality Under Section 1 of the Sherman Antitrust Act*, 38 U.Pitt.L.Rev. 87 (1976); Note, *Unfair Competition Under the Sherman Act*, 59 Iowa L.Rev. 1194 (1974); Note, *Acts of Unfair Competition with Intent to Injure a Competitor Held a Per Se Violation*, 42 Fordham L.Rev. 909 (1974).

Critics of *Pick-Barth* make several telling points. The first is that the definition of "unfair means" is so vague that the *Pick-Barth* cases fail to draw the bright line of illegality which is essential if a *per se* rule is to achieve its purpose as a guide to business planning. There is no federal law of unfair competition. *Pick-Barth* and *Perryton* rely on dictum concerning unfair competition in the pre-*Erie* case, *Hitchman Coal & Coke Co. v Mitchell*, 245 U.S. 229, 259, 38 S.Ct. 65, 62 L.Ed. 260 (1917). The language may be contrary to the law of unfair competition as it is now understood in the states. *See* 45 Am.Jur.2d *Interference* § 46. Significantly, the plaintiff in this case cites no non-*Pick-Barth* cases, state or federal, that indicate the conduct of which he complains has been recognized as unfair competition, though offenses such as misappropriation of trade secrets and disparagement are generally recognized. *See Developments in the Law—Competitive Torts*, 77 Harv.L.Rev. 888 (1964). Even if we were to adopt the law of the forum state, the cases defining unfair competition are likely to be in noticeable disarray. In the words of one authority, "progress in the development of guiding principles in the law of unfair competition is still 'a consummation devoutly to be wished.'" 1 R. Callmann, Unfair Competition, Trademarks & Monopolies iii (3d ed. 1967). The Texas courts even conflict on whether a customer list is a trade secret. *See Mercer v. C. A. Roberts Co.*, 570 F.2d 1232, 1238–1239 (5th Cir. 1978) (no trade secret) (alternative holding).

On a more fundamental level, the *Pick-Barth* doctrine fails to perceive that the purposes of antitrust law and unfair competition law generally conflict. The thrust of antitrust law is to prevent restraints on competition. Unfair competition is still competition and the purpose of the law of unfair competition is to impose restraints on that competition. The law of unfair competition tends to protect a business in the monopoly over the loyalty of its employees and its customer lists, while the general purpose of the antitrust laws is to promote competition by freeing from monopoly a firm's sources of labor and markets for its products. *See Kinnear-Weed Corp. v. Humble Oil & Refining Co.*, 214 F.2d 891, 894 (5th Cir. 1954), *cert. denied*, 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1955) (patent infringement is not an injury

cognizable under the Sherman Act); Yoerg, *Misappropriation Claim,* 22 Antitrust Bull. at 33.

An instance where the result of antitrust law and unfair competition law enforcement may not conflict is when a firm with substantial market power, perhaps approaching that of a monopoly, uses unfair competition to augment its position by eliminating a rival concern from the market. But it is the elimination of the competition, by fair means or foul, that is the concern of the antitrust law, and it is only the unfair method on which the law of unfair competition focuses.

The more modern courts examining the *Pick-Barth* rule have stated that it applies only when the defendant is a "significant existing competitor." *Southland Reship, Inc.,* 401 F.Supp. at 346–347; *see George R. Whitten, Jr., Inc.,* 508 F.2d at 562; *Tower Tire & Auto Center, Inc.,* 392 F.Supp. at 1108–1109. *But see Atlantic Heel Co.,* 284 F.2d at 881; *Metal Lubricants Co. v. Engineered Lubricants Co.,* 411 F.2d 426, 430 (8th Cir. 1969). While this requirement begins to limit *Pick-Barth* to Sherman Act proportions, it fails to do the job entirely.

The Sherman Act was conceived as a weapon against monopolies, trusts, and conspiracies which used agreement instead of financial consolidation to achieve the same results. The market power of the defendant charged with a *Pick-Barth* violation is crucial, for two reasons.

First, absent some market impact comparable to that which would be forbidden by the law of mergers, the interests protected by the antitrust laws never arise. *See, e. g., United States v. General Dynamics Corp.,* 415 U.S. 486, 494–498, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). *See generally,* L. Sullivan, Antitrust § 204 (1977). If a defendant could achieve a desired result either by lawful merger or by engaging in unfair competition, the choice of the unfair competition route alone should not give rise to an antitrust violation.

Second, only if the defendant can gain an increment of monopoly through his unfair competition would the additional sanctions of the Sherman Act, including treble damages and criminal sanctions, be appropriately used to deter him. Single damages or equivalent injunctive relief is thought sufficient to compensate a firm for unfair competition. *Cf.* R. Posner, Economic Analysis of Law 28–29 (1973) (decrying remedies other than actual damages for breach of a restrictive covenant).

The "significant existing competitor" requirement misses the mark in several respects. By not aiming at market power, it omits a number of relevant considerations, including the defendant's market share before and after the unfair conduct, the number and relative size of firms in the market, the conditions of entry, the potential competition from firms outside the market, and whether a trend toward concentration exists. It also excludes cases in which a new entrant possesses such dramatic market power that his conduct, aimed at eliminating competition, threatens the values protected by the Sherman Act. *Cf. United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (certain market extension mergers illegal).

*Cherokee Laboratories, Inc.* was such a case. There one of the defendants, the plaintiff's supplier, had an exclusive dealing arrangement with the holder of a patent. The plaintiff was its only distributor. The supplier decided to begin its own distribution business. It hired away an employee of the plaintiff, raised prices to the plaintiff, and conspired to eliminate the plaintiff from the market. The supplier established a 150 percent markup on its own distribution even though only 20 percent of the market was being served. The plaintiff had unsuccessfully attempted to distribute a rival and inferior product not furnished by the defendant supplier. The district court granted summary judgment for the defendants, and this Court reversed. We held the patent monopoly could not be extended past the first sale, that the high markup and the low service in the distribution market indicated a lack of competition there, and consequently the conspiracy es-

tablished the "public injury," or injury to competition, necessary to establish a claim under Sherman Act § 1. *Cherokee Laboratories, Inc.* is an unusual case, because the defendant, although a new entrant in the distribution market, was a potential monopolist because of its control of supply.

We think the line drawn by the *Pick-Barth* doctrine is so vague, and the circumstances in which its application manifests any injury to competition so dependent on individual facts that it does not merit the *per se* characterization some of the early cases give it. Defendants should be permitted to argue that their competitive acts, fair or unfair, have not produced an impermissible degree of market power, and that their use of misappropriated business resources evinces an increase in competition, not a reduction. An instructive analogy lies in the law of mergers, where the rule of reason also controls. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 321–322, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); E. Gellhorn, Antitrust Law & Economics 329–330 (1975).

One other consideration bolsters our conclusion. Congress has repeatedly declined to create a federal law of unfair competition. 1 R. Callmann, Unfair Competition, Trademarks & Monopolies 4.3 at 137–142 (3d ed. 1967) & 35 (Supp.1976). The Federal Trade Commission has the power to correct "unfair or deceptive acts or practices," 15 U.S.C.A. § 45(a)(1), but the language of the Sherman Act does not give that power to private plaintiffs. Courts should be circumspect in adopting doctrines that have even the appearance of disturbing a congressional balance of remedies.

We thus reject the *per se* rule of *Pick-Barth* and adopt a rule of reason to be applied on a case-by-case basis in situations where competitive forces protected by the Sherman Act suffer some palpable injury.

## IV. *Anticompetitive Effect*

To prove an antitrust violation under the rule of reason, Northwest must show the defendants' conduct adversely affected competition. That showing is essential, because "[a]n antitrust policy divorced from market considerations would lack any objective benchmarks." *Continental T. V., Inc.*, 433 U.S. at 53 n.21, 97 S.Ct. at 2560. *See* Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Sylvania *Decision*, 45 U.Chi.L.Rev. 1 (1977). An evil intent alone is insufficient to establish a violation under the rule of reason, although proof of intent may help a court assess the market impact of the defendants' conduct. *See Chicago Board of Trade*, 246 U.S. at 238, 38 S.Ct. 242.

The district court held that Northwest had shown only the substitution of one distributor for another, and so had failed to produce facts which would demonstrate anticompetitive effect upon the business of selling and servicing PAT equipment in the North Texas region. On that reading of the evidence, its legal conclusion was impeccably correct. *Burdett Sound, Inc.*, 515 F.2d at 1248; *Cherokee Laboratories, Inc.*, 383 F.2d at 104 (dictum); *Craig*, 515 F.2d at 224; *Ace Beer Distributors, Inc.*, 318 F.2d at 287.

The examination of this case, however, cannot stop without an inquiry into the market power of the defendants. *Burdett Sound, Inc.* indicated the evidence there showed "no effort by either [defendant] to establish market dominance," 515 F.2d at 1248. In *Cherokee Laboratories, Inc.* an anticompetitive effect was said to exist when the new distributor, if effective in driving out the old, would become a monopolist. *See also Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 469, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Furthermore, this case, like *Cherokee Laboratories, Inc.*, entails interbrand as well as intrabrand competition.

Omark and Bosco conspicuously lack the kind of market power possessed by the defendants in *Cherokee Laboratories, Inc.* The plaintiff does not assert that they have patents that would make monopoly a possibility. In fact, Omark only has a 25 percent share of the national manufacturing market, and faces eight other competitors, one

of which is larger than Omark. Northwest has not shown that either Omark or Bosco earns an excessive profit on its business, or that the PAT market as a whole lacks full service.

From a structural perspective, the defendants' conduct *enhanced* rivalry rather than reducing it. Where, for all practical purposes, only Northwest stood before, there are now two: Northwest and Bosco. Northwest argues that its fall in market share demonstrates an adverse effect on competition, but that argument mistakes competitors for competition. Certainly Northwest has been injured, but the fall from grace of the number two firm which held a 20 percent market share, and its replacement by a new firm with an 11.5 percent share, reduces market concentration and increases the competitive possibilities. That would be true even if Northwest's two percent share were eliminated entirely. It is also significant that McLeroy Fasteners has stayed in the market and Omark, the supplier, remains a potential competitor.

Northwest suggests injury to competition because past Northwest customers who bought Omark tools cannot get adequate service from Bosco. That may represent nothing more than a temporary dislocation, because purchasers of PAT products will buy other brands if Bosco's poor service is significant. At worst, it represents bad business judgment by Omark. Given the competitive structure of the market, it cannot be taken as an indication that Omark has market power.

Finally, Northwest asserts competitive injury because it was forced to raise its prices to compensate for overhead on its lower volume. Northwest's ability to raise its prices may indicate that *Northwest* possessed unusual market power in some fashion, but it cannot be taken as an indication that the *defendants* possessed such power, or that their conduct affected prices in the PAT market generally. *See Kestenbaum v.*

*Falstaff Brewing Corp.,* 575 F.2d 564 (5th Cir. 1978). Northwest has failed to show anticompetitive effect and so cannot establish an antitrust violation under the rule of reason.

AFFIRMED.