MID–WEST UNDERGROUND STOR-
AGE, INC., Plaintiff-Appellee
Cross-Appellant,

v.

Louis PORTER, Hillside Underground
Storage, Inc., Hillside, Ltd., and Dalco
Petroleum, Inc., Defendants-Appellants
Cross-Appellees.

and

M–P PETROLEUM, LTD., Defendant
Cross-Appellee,

v.

Bill P. MOON and Walter E. Scott,
Counterclaim Defendants Appellees.

Nos. 81–1034, 81–1049.

United States Court of Appeals,
Tenth Circuit.

Sept. 6, 1983.

Rehearing Denied Nov. 3, 1983.

John T. Conlee, Wichita, Kan., and Floyd L. Walker, Tulsa, Okl. (Thomas D. Kitch, Wichita, Kan., with them on brief), for defendants-appellants, cross-appellees.

Gerald Sawatzky, Wichita, Kan. (Dwayne C. Pollard of Blackstock, Joyce, Pollard, Blackstock & Montgomery, Tulsa, Okl., with him on brief), of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for plaintiff-appellee, cross-appellant.

Before HOLLOWAY, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

The plaintiff, Midwest Underground Storage, Inc., brought an action against its former president Francis G. Melland, a former stockholder Louis Porter, and various entities controlled by Melland or Porter, alleging that the defendants violated § 1 of the Sherman Act by conspiring to engage in unfair competition for the purpose of eliminating Midwest as a competitor. Midwest also alleged that the defendants' conduct constituted business torts under state law. Porter counterclaimed against Midwest and stockholders Bill Moon and Walter Scott. Prior to trial, defendants Melland and M–P Petroleum, Inc. settled with Midwest and were dismissed from the action. The case was submitted to the jury on special interrogatories. The jury found in favor of Midwest on the antitrust claim in the amount of $250,000 and on the other claims in the amount of $3,911,637; the jury denied Porter's counterclaim. After various motions and orders the court entered final judgment on the verdict, trebling the antitrust award to $750,000 and awarding Midwest the $3,911,637 on the other claims but refusing to treble it. Prior to entering final judgment the court concluded that it lacked in personam jurisdiction over M–P Petroleum, Ltd. and dismissed M–P from the action. Both Midwest and the defendants appealed. The issues on appeal are (1) whether the district court erred in denying the defendants' motion for directed verdict on the antitrust claim, (2) whether the court erred in refusing to order a new trial on the state law claims, and (3) whether the court erred in refusing to enter judgment on the state law claims against defendants other than Porter and in holding that it lacked in personam jurisdiction over M–P Petroleum, Ltd.

Midwest was formed in 1969 to develop underground facilities for the storage of liquid petroleum gas (LPG) products. Fifty percent of the stock was originally controlled by Moon, Scott, and Porter, who held equal numbers of shares. The remaining stock was held by Melland and three others, each of whom owned ⅛ of the corporation's outstanding shares. Melland became president of Midwest and directed the construction and the operation of the facilities. In 1973, after Scott, Moon, and Porter had a falling-out, Porter transferred his ownership interest in Midwest to Scott and Moon. Thereafter, Melland and Porter jointly engaged in various business activities, ultimately forming a corporation to operate competing underground storage facilities. When certain of Melland's activities were challenged as being in derogation of his fiduciary duties as president of Midwest at a stockholders meeting in May 1974, he resigned the presidency of Midwest. Moon became president of Midwest, and Midwest argues that only then did it become aware of the extent to which Melland had violated his fiduciary duties. Midwest's complaint alleged that the defendants conspired to use Melland's position as president of Midwest to eliminate Midwest as a competitor by diverting corporate opportunities, by failing to expand Midwest, and by otherwise using Midwest for personal gain.

I

The defendants contend that the district court erred in refusing to direct a verdict against Midwest on the antitrust claim. They argue that the complaint does not state a per se violation and that Midwest failed to prove injury to competition as required under rule of reason analysis. Asserting that a per se violation was alleged and proven and that the record reflects injury to competition, Midwest argues that

the record adequately supports the jury's finding of liability under § 1 of the Sherman Act. We turn first to whether the conspiracy alleged constitutes a per se violation.

### A

The per se instruction Midwest sought and the court refused was:

"In this case, if you find that one or more defendants combined or conspired with another, such as Francis G. Melland, to use Melland's position as president and manager of plaintiff to cripple plaintiff's operations with the intent to eliminate plaintiff as a viable competitor, then such defendant or defendants are guilty of a per se violation of the federal statute, and are liable for the damages caused to plaintiff."

App. I, 92. Midwest argues that such a conspiracy is a per se violation because it is "horizontal in nature for the purpose of excluding plaintiff from competition." Brief of Plaintiff-Appellee and Cross-Appellant at 46. The contention that a horizontal conspiracy to suppress competition through the elimination of a competitor by unfair means constitutes a per se violation is derived from *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir.1932), *cert. denied,* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932).[1] Some courts have viewed this Court's decision in *Perryton Wholesale, Inc. v. Pioneer Distributing Co.,* 353 F.2d 618 (10th Cir.1965), *cert. denied,* 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), as adopting the *Pick-Barth* per se rule. *See, e.g., Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 555 (7th Cir.1980); *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83, 86 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). But in *Craig v. Sun Oil Co.,* 515 F.2d 221, 224 (10th Cir.1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976), we said *Perryton Wholesale* "is not necessarily a per se case

despite the citation of the First Circuit cases." This Circuit has not held that a conspiracy to eliminate a competitor by unfair means constitutes a per se violation, and we decline to do so now.

Generally, conduct alleged to violate the Sherman Act is scrutinized under the rule of reason rather than the per se rule, and "departure from the rule-of-reason standard must be based upon demonstrable economic effect." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–2562, 53 L.Ed.2d 568 (1977). "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–1134, 31 L.Ed.2d 515 (1972). Per se rules are fashioned to promote litigation efficiency and business certainty by prohibiting conduct that is characterized by a "pernicious effect on competition and lack of any redeeming virtue." *Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). However, despite the ominous tenor of the phrase "conspiracy to eliminate a competitor by unfair means," such conspiracies have not been shown to be consistently anticompetitive; they may actually have a beneficial effect on competition by facilitating new entry or otherwise decreasing concentration. *See, e.g., Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d at 90–91.

"The difficulty with [the per se] approach is that the alleged conspiracy tends to be a spurious one, often between the defendant and parts of his own enterprise. Given, moreover, that the hiring of a rival's employees is not ordinarily exclusionary, even when done by a monopolist, characterizing the employment as a conspiracy seems little more than a semantic trick that is inconsistent with employee mobility. Many courts have wisely stepped back from the per se hold-

---

**1.** The First Circuit later severely limited the scope of the rule of *Pick-Barth.* *See George R. Whitten, Jr., Inc. v. Paddock Pool Builders,* *Inc.,* 508 F.2d 547, 561–62 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

ings of the earlier cases, recognizing that such conduct is not always exclusionary."

3 P. Areeda & D. Turner, *Antitrust Law* § 828b, at 323 (1978) (footnotes omitted). The conspiracy alleged here appears to be of the "spurious" type: the actors are Porter, Melland, and corporations they jointly control. The conspiracy is not one of erstwhile competitors combining to supplant competition with cooperation. Some of the defendants are not in the relevant geographic market. Others did not exist prior to Melland's resignation. None competes with other defendants. Conspiracies of the type alleged here are not consistently exclusionary and do not carry the same trappings that characterize conduct treated under the per se rule.

 Other considerations also militate against applying per se analysis to a conspiracy to eliminate a competitor by unfair means. First, "the definition of 'unfair means' is so vague that the *Pick-Barth* cases fail to draw the bright line of illegality which is essential if a *per se* rule is to achieve its purpose as a guide to business planning." *Northwest Power Products,* 576 F.2d at 90. Second, as noted in *Northwest Power Products,* the Sherman Act is intended to prevent restraints on competition, whereas "[u]nfair competition is still competition and the purpose of the law of unfair competition is to impose restraints on that competition." *Id.* at 88. There is, therefore, fundamental conflict between antitrust and unfair competition law; this counsels against basing per se illegality under the Sherman Act on the violation of unfair competition laws. A related difficulty is isolating the impermissible "intent to eliminate a competitor" from the permissible "intent to engage in cutthroat competition." Because intent is nearly always determined by inference, and because the same conduct could support the inference of both a permissible and an impermissible

intention, a per se rule prohibiting conspiracies to eliminate competition by unfair means would sweep too broadly. Third, there is no indication that Congress intended to balkanize antitrust law by permitting antitrust illegality to turn on the unfair competition law of the various states; making "unfair means" an element of the violation would cause the content of the Sherman Act to vary from state to state.

> "[T]he Sherman Act was not enacted to police interstate transportation, or to afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity . . . ."

*Apex Hosiery Co. v. Leader,* 310 U.S. 469, 512, 60 S.Ct. 982, 1002, 84 L.Ed. 1311 (1940). Fourth, Congress has repeatedly refused to enact a federal cause of action for unfair competition, 1 E. Callman, *Unfair Competition, Trademarks & Monopolies* ¶ 4.3, at 137–42 (3d ed. 1967 & Supp.1976 at 35), and instead has given the Federal Trade Commission the exclusive authority to police unfair practices. *See* 15 U.S.C. § 45. This cautions against using the Sherman Act as a mandate to regulate unfair competition. Finally, unfair competition law is grounded in ethical considerations that are irrelevant to, or even inconsistent with, the economic considerations on which the antitrust laws are based. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–92, 98 S.Ct. 1355, 1363–1365, 55 L.Ed.2d 637 (1978). We conclude, therefore, that conspiracies of the type alleged herein should be assessed under the rule of reason. *Accord Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 555–56 (7th Cir.1980); *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.,* 578 F.2d 1256, 1260–61 (8th Cir.1978); *Northwest Power Products,* 576 F.2d at 90.[2]

---

2. Midwest also argues that a conspiracy to eliminate a competitor by unfair means is a per se violation because the conspiracy constitutes something akin to a market allocation agreement, a concerted refusal to deal, and a price fixing arrangement. Brief of Plaintiff-Appellee

and Cross-Appellant at 35–42. Midwest contends that Melland's diversion of its corporate opportunities constituted a market allocation agreement because it diverted what would otherwise have been Midwest's share of the market. The essence of a market allocation viola-

### B

■ We turn next to the defendants' contention that Midwest failed to prove injury to competition, necessary under rule of reason analysis, and that therefore the district court erred in refusing to direct a verdict against the Sherman Act § 1 claim. Midwest argues that sufficient evidence of injury to competition was adduced through the testimony of Dr. Randall Haydon, David Onsgard, Bill Moon, and Walter Scott. We are very reluctant to overturn a jury verdict on the basis of insufficiency of the evidence. But after review of the record, we agree with the defendants that the evidence does not support the verdict. The evidence could support a finding of injury to a competitor, but not a finding of injury to competition in the sense contemplated by the antitrust laws. *See generally George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 562 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). The defendants' motion for directed verdict, therefore, should have been granted.

Dr. Haydon's testimony regarding injury to competition came in response to hypothetical questions put to him by counsel for Midwest.

"Q. Now, further assume that the demand for underground storage in late 1973 and 1974 exceeded the supply for storage in the State of Kansas and elsewhere, that two or three relatively new companies have started and are able to meet the excess demand, and further assume that two of the new companies have the same President, who owns a much greater interest in one company than the other and gives preference in major business decisions for expansion to the company he has greatest ownership in, do you have an opinion as to whether those facts would affect competition in that market?

A. I do.

Q. And what is that opinion?

A. Well, no man can serve two masters. No man is going to compete with himself on price; therefore, in fact if you had two or three firms, you would really only have two competing, therefore, they would not be as effective competition for that demand as there would have been with three firms competing.

Q. And would that have an effect generally on consumers of the product for which there is that competition?

A. Yes, it would.

Q. Would it have a detrimental effect, or a good effect so far as competition?

tion, however, is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers. There is no evidence of any market division here, either among the defendants or between Midwest and the defendants. Instead, the defendants attempted to control Midwest's share of the market by excluding Midwest. This does not constitute the type of anticompetitive conduct condemned as a per se unlawful market allocation.

Neither does the alleged conspiracy constitute a concerted refusal to deal. Concerted refusals to deal are generally characterized by conduct inducing a competitor's suppliers or customers to refuse to deal with that competitor. *See, e.g., Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators'*

*Guild of America, Inc. v. Federal Trade Commission,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Here, there is no allegation or evidence that Midwest's suppliers or customers have refused to deal with Midwest; nor is there evidence that the defendants have conspired to boycott those suppliers or customers to coerce such a refusal.

Midwest's attempt to characterize the conspiracy as price fixing is also unconvincing. The foreclosure of price rivalry between Midwest and the defendants does not, by itself, constitute price fixing, and there is no evidence of an agreement between Midwest and the defendants or of an agreement among the defendants to fix or manipulate the price of storage. That the defendants were able to charge more than Midwest would have charged does not compel the conclusion that they engaged in supracompetitive pricing.

A. It would cost the consumer a higher price for the purchase of that service.

Q. So there would be an injury to competition?

A. Yes."

App. I, 415–16. Dr. Haydon's testimony does not establish injury to competition. His opinion did not explicitly treat, nor was it grounded upon, any discussion of the structural characteristics of the market that actually existed—the number of competing firms, the relative market share of each, or the potential of new entry into the market—evidence that could support a conclusion that the elimination of price competition between Midwest and the defendants would lead to monopoly pricing. Also absent from Dr. Haydon's testimony and the record is any indication of an increase in concentration or other evidence from which an anticompetitive aggregation of market power could be inferred. Instead, the record appears to contradict the assumptions of fact implicit or explicit in the questions put to Dr. Haydon. The record demonstrates that the 1973–1974 period was a peculiarly advantageous time for those in the LPG underground storage business because of the OPEC oil embargo. The demand for storage space exceeded the supply and prices rose rapidly. At least two new competitors to Midwest in addition to the Melland-Porter company entered the market about that time. Midwest was able to lease all of its storage space at relatively high prices. The assumption that Melland was a principal in Midwest and in a competing company (although in fact Melland's competing company was formed after he resigned as Midwest's president), and that instead of devoting his time to expanding the storage capacity of Midwest Melland devoted that time to building the competitor in which he had a greater economic interest, may give rise to the inference that Midwest was injured as a competitor but falls short of providing a basis for the conclusion that competition in the geographic market in which both operated was reduced. Thus, Dr. Haydon's responses to the questions did not establish injury to competition. Melland's failure to expand Midwest so that it could absorb the increased demand and prevent entry of the Melland-Porter company into the marketplace does not demonstrate that Melland's actions increased the price of LPG storage in the market; nor does it reflect injury to the competitive market. This is like the situation presented in *Northwest Power Products,* in which the unfair competition of the conspiracy enhanced rivalry in the market rather than reduced it.

The evidence adduced through Moon, Scott, and Onsgard neither cures the deficiencies in Dr. Haydon's testimony nor itself shows injury to competition. Moon's testimony related to establishing the Conway-Hutchinson area as the relevant geographic market, but did not reflect injury to competition in that market. Scott's testimony related almost exclusively to how Melland's conduct injured Midwest. He made no statements regarding injury to competition in the relevant market. Onsgard offered testimony relating to the geographic market and concerning the relative size of the various storage facilities in the market. His testimony, however, was not sufficiently detailed to support inferences regarding the effect of the conspiracy on competition.

The evidence, taken as a whole, fails to show that the defendants injured competition. There is no showing that their conduct raised entry barriers, increased concentration, or otherwise led to the acquisition or exercise of market power. Even if we were willing to infer injury to competition if Midwest had been eliminated from the market or severely injured as a viable competitor, the record does not reflect such injury. During the time in question, Midwest expanded its capacity; it fully rented its existing capacity; it could and did increase its storage fees. It had lower incremental costs for storage expansion than most of its rivals, especially new entrants, because its rail and other facilities were in place. Although Midwest made a jury case that it lost opportunities to increase profits and to strengthen its position in the market, it did not establish injury to competition as

opposed to injury to a competitor. Consequently, the district court erred in refusing to direct a verdict against Midwest on its antitrust claim.

## II

We turn now to the pendent state law claims for unfair competition, loss of corporate opportunities, self-dealing, and other fiduciary breaches. Even though we have concluded that the court should have directed a verdict for the defendants on Midwest's federal claim, that claim, measured at the outset of the litigation, was substantial, especially in light of *Perryton Wholesale*. Because the federal claim was substantial, and because the state claims arose from a common nucleus of operative facts, pendent jurisdiction was proper. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 721–29, 86 S.Ct. 1130, 1136–1140, 16 L.Ed.2d 218 (1966).

Although the evidence is conflicting, the record supports the jury's verdict holding Porter liable as a coconspirator with Melland for Melland's actions in violation of his fiduciary duties. Kansas imposes very strict fiduciary responsibilities upon its directors and officers, *see Delano v. Kitch*, 663 F.2d 990 (10th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *Newton v. Hornblower, Inc.*, 224 Kan. 506, 582 P.2d 1136 (1978), and a coconspirator in a breach of fiduciary duty is liable for damages. *See generally International Union, UAW v. Cardwell Manufacturing Co.*, 416 F.Supp. 1267, 1290 (D.Kan. 1976). Furthermore, we have examined the court's instructions of which the defendants complain and find the instructions sufficient not to mislead the jury on the law.

Had the jury returned a verdict for $4,000,000, or almost any figure even slightly different from the $3,911,637 total it did return, we would have little trouble affirming the judgment. The difficulty is that the $3,911,637 judgment is the exact amount claimed by Midwest in exhibits and arguments it presented before the jury [3] for LPG product shortage—a damage item that was contingent upon a finding that Midwest was liable on Porter's counterclaim. However, the jury exonerated Midwest from liability for LPG shortage by denying the counterclaim, even though it found for Midwest in the total amount of $3,911,637. There was, of course, no explanation of how the jury arrived at its verdict.

The defendants requested a new trial. The district court initially agreed that the amount of the verdict was improper and awarded a new trial on damages only. Midwest then argued for reconsideration, urging that the award was within the range of the evidence, that the jury clearly intended to find the defendants liable on all state law claims, and that the mere coincidence of the award with the amount claimed for LPG product shortage did not justify setting aside the verdict. It also argued that because the jury found against Porter on the counterclaim, it could not have intended the amount awarded to represent damages for product shortage. On reconsideration the district judge reinstated the jury verdict and reversed his earlier new trial ruling. He recognized, as do we, that in this case it is logically impossible to award a new trial on damages only.

"We have been unable to construct any logic which would permit us to vacate the award as we did without also being compelled by defendant's argument that the award evidences the finding of the jury

---

**3.** The figure $3,911,637 was listed on plaintiff's exhibit 100, which set forth the manner in which Midwest's damage claim for LPG product shortage was calculated, and on plaintiff's exhibit 104, which summarized the various damage claims and is reconstructed as follows:

SUMMARY OF DAMAGES

| | |
|---|---|
| Deal #1 – El Paso – Hutchinson Storage | $3,686,500 |
| Deals #2, 3 & 4 – El Paso – Canadian transactions | $5,628,250 |

SUMMARY OF DAMAGES

| | |
|---|---|
| Empire Gas Underground Storage | $400,000 |
| Loss of value because additional 1,000,000 BBLS. of storage not developed in 1973–74 | $1,150,000 |
| Unpaid charges – Midwest Underground Storage | $173,400 |
| PRODUCT SHORTAGE: | |
| LPG's Mid-West Underground Storage | $3,911,637 |
| No. 2 fuel oil – TWC – Potwin | $101,549 |
| Dalco negative at M.W.U.S. | $739,169 |

that defendant Porter was liable to plaintiff only for product shortages; as to all the other claims, the jury found against plaintiff. In other words, if the amount of the jury award is sufficient of itself to cause us to conclude that it was derived from one improper source, namely the product shortages, it is no less sufficient for the conclusion that the jury found plaintiff was entitled to recover only on the product shortages claim, and not on any other state law claims."

App. I, 196.

The only amount (other than the $250,000 antitrust damages) that the jury awarded was the exact total—to the dollar—claimed for the product shortage, which Midwest would have suffered only if Porter had won his counterclaim. Yet by denying Porter's counterclaim, the jury essentially found that there was no product shortage for which Midwest could recover. We can conceive of two plausible explanations for this apparent contradiction. One is that the jury intended to find for Midwest on the state claims (understanding that the product shortage claim was not an element of the damages) and either coincidentally arrived at the $3,911,637 figure or deliberately picked it because it was within the range of the evidence and the jury was somehow attracted to it regardless of the claim to which it was associated on the exhibits. While the likelihood of a coincidence in numbers may be very small, the possibility of the special attractiveness of $3,911,637 as a consciously selected damage award appears to us to be a distinct possibility. The jury had before it exhibit 104, which displayed a variety of numbers, including the $3,911,637 figure. Exhibit 104 also contained a damage figure for some of the state law claims which, when added with other figures of damage the jury could award, would come close to the $3,911,637 figure. The second plausible explanation is that the jury was confused and that its answers to special interrogatories do contradict its damage award. If so, perhaps the jury intended to award Midwest this amount for product shortage regardless of the decision on the counterclaim and to deny damages for the other claims despite the finding of liability on those claims.

The first explanation would require that we uphold the award, the second that we reverse and remand for a new trial on both liability and damages. Given this choice between a possible proper determination of a figure and a possible instance of jury confusion, we cannot freely exercise our own judgment as to the most plausible. We face two barriers to reversing the verdict.

The first barrier is the traditional sanctity of jury verdicts. It is well settled that a verdict will not be upset on the basis of speculation as to the manner in which the jurors arrived at it. *Howard D. Jury, Inc. v. R & G Sloane Manufacturing Co.,* 666 F.2d 1348, 1349–52 (10th Cir.1981); *see Air-Exec, Inc. v. Two Jacks, Inc.,* 584 F.2d 942, 945 (10th Cir.1978). In deciding not to award a new trial, the trial court relied upon *Chicago, Rock Island and Pacific Railroad v. Speth,* 404 F.2d 291 (8th Cir.1968), which states:

"[A] trial judge may not have the same jury reconsider what *appears* to him (or what he might determine upon general inquiry) to be a miscalculation of general damages. Appearances do not always ring true, and possible prejudice by the court's inquiry may easily take place. To allow a judge to question a jury's process of deliberate decision, even though done in good faith to avoid an apparent miscarriage of justice, could result in abuses far outweighing the infrequent inability to correct what may *appear* to be or is erroneous or a misunderstanding. . . .

If the court's interrogation of the jury as to the amount of the verdict could be condoned in the instant case, then it would logically follow that the court or counsel could seek to correct a verdict on matters that are traditionally considered inherent in the verdict. If the verdict for $16,000.00 had been received, counsel could not have later shown by affidavit that the $16,000.00 was erroneously computed. Such a rule may seem harsh, but it is premised upon sound reasons of pub-

lic policy. It is well settled that a jury's misunderstanding of testimony, misapprehension of law, errors in computation or improper methods of computation, unsound reasoning or other improper motives cannot be used to impeach a verdict. These matters all inhere in the verdict itself."

*Id.* at 295 (footnote omitted). The $3,911,637 figure is well within the range of the evidence.

■ The second barrier to reversal inheres in our position as an appellate court. The decision whether to grant a new trial is committed to the informed discretion of the district court, which is generally in a better position to evaluate claims of jury confusion or other error in the verdict. *E.g., Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1388 (10th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982). Our standard of review of a trial court's refusal to grant a new trial is whether the court abused its discretion. *Id.* After careful review of the record we are unwilling to hold that the trial court abused its discretion when it denied a new trial in this case. Courts have refused to find error in other jury verdicts with coincidences of figures almost as compelling as this one. *See, e.g., Estes v. Southern Pacific Transportation Co.,* 598 F.2d 1195, 1199–1200 (10th Cir.1979); *George v. Bolen,* 2 Kan. App.2d 385, 580 P.2d 1357 (1978). We therefore affirm the jury verdict on the state law claims in the amount of $3,911,637.

We uphold the jury verdict denying the counterclaim as adequately supported by evidence in the record. The defendants' argument that the court erred in dismissing portions of Porter's counterclaim is without merit.[4]

### III

■ The trial court dismissed M–P Petroleum, Ltd. from the case after trial for lack of in personam jurisdiction. The court explained the dismissal of M–P on the ground that Midwest failed to establish that M–P performed any act that would bring it within the jurisdiction of the court. The court recited that M–P was formed approximately seven weeks prior to Melland's resignation as Midwest's president. It cited no authority, declaring only, "After review of trial notes and consideration of defendants' argument, the Court is of the opinion, and must conclude, that plaintiff's evidence failed to establish that M–P Petroleum, Limited performed any act which would bring that corporation within the jurisdiction of this Court, pursuant to the Kansas 'long-arm' statute, K.S.A. 60–308." App. I, 183. Citing *Ammon v. Kaplow,* 468 F.Supp. 1304, 1312 (D.Kan.1979), and *Professional Investors Life Insurance Co. v. Roussel,* 445 F.Supp. 687, 696 (D.Kan.1978), Midwest argues that because M–P participated in a conspiracy to commit a business tort in Kansas, the actions of the coconspirators bring M–P within the reach of the Kansas long-arm statute. *Kaplow* and *Roussel* represent the general rule regarding long-arm jurisdiction over out-of-state coconspirators. *See* R. Casad, *Jurisdiction in Civil Actions* §§ 403[1][b], 7.09[3] (1983). We are not told the basis for the court's ruling. The court may have found that M–P was not a coconspirator and consequently that it had no contacts with the state. However, without a more detailed explanation of the basis for the dismissal of M–P, we cannot review that determination. Consequently, the order dismissing M–P is vacated. The court on remand should issue a new ruling setting forth the factual and legal conclusions underlying the ruling.

The trial court entered the judgment for $3,911,637 only against defendant Porter. No explanation was given for limiting the entry of judgment to Porter alone. On remand the court should address this issue and set forth the factual and legal bases for its conclusion.

---

**4.** Because we have held there was no antitrust violation proved, we need not consider Midwest's arguments that the total award should be trebled or that the court erred in the amount awarded as attorney's fees.

## IV

On remand, the district court is directed to enter judgment n.o.v. for the defendants on the antitrust claim and to vacate its judgment awarding attorney's fees on that claim. The court's judgment against defendant Porter on the state law claim is affirmed in the amount of $3,911,637, although the court should consider whether Hillsdale, Ltd., Hillsdale Underground Storage, Inc., Dalco Petroleum, Inc., and M–P Petroleum, Ltd. should also be liable for that judgment.

The case is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.