**O.S.C. CORPORATION, etc., et al., Plaintiffs,**

v.

**APPLE COMPUTER, INC., Defendant.**

**APPLE COMPUTER, INC., Counterclaim Plaintiff,**

v.

**O.S.C. CORPORATION, etc., et al., Counterclaim Defendants.**

**No. CV 81–6132–PAR (GX).**

United States District Court, C.D. California.

Jan. 11, 1985.

Jack Corinblit, Marc M. Seltzer, Corinblit, Shapero & Seltzer, Los Angeles, Cal., for plaintiffs.

Gary L. Reback, Fenwick, Stone, Davis & West, Palo Alto, Cal., for defendant.

## MEMORANDUM OF DECISION AND ORDER

RYMER, District Judge.

This case is before the Court on the motion of defendant Apple Computer Inc. ("Apple") for reconsideration of the Court's denial of Apple's motion for summary judgment.

The complaint in this case was filed by six computer dealers in December of 1981, seeking preliminary and permanent injunctive relief restraining Apple from adopting a prohibition against the mail order sale of its products by authorized Apple dealers. On December 4, 1981, plaintiffs moved for a temporary restraining order, but the Court denied that request. The Court then received voluminous briefs and heard oral argument, at the conclusion of which plain-

tiffs' motion for a preliminary injunction was denied:

> It would be the Court's position that the Court does not feel that there is a serious question as to the law involved here and as to the claims made by plaintiffs nor does the Court feel there is a sufficient showing of likelihood of success by the plaintiffs.

Transcript, December 21, 1981 at pp. 96–97.

After a lengthy period of discovery, Apple moved for summary judgment. In response to a motion by plaintiffs, the court granted an extension of the discovery period to allow plaintiffs additional discovery for the purpose of responding to Apple's motion. The summary judgment motion was argued to the Court on March 14, 1983, and the Court took the motion under advisement. On May 27, 1983, this case was transferred to a newly-appointed judge pursuant to the recommended procedure adopted by the Central District of California for the creation of calendars for newly appointed judges. The judge to whom Apple's motion was submitted originally, the Honorable Consuelo B. Marshall, subsequently denied Apple's motion. *O.S.C. Corp. v. Apple Computer Corp.*, 1983–2 Trade Cases (CCH) 65,493 (C.D.Ca.1983). Apple then filed the instant motion for reconsideration, based on decisions of the Ninth Circuit Court of Appeals rendered contemporaneously with and subsequent to Judge Marshall's decision.

The Court has reviewed the entire record in this case, including all of the deposition transcripts. Based upon that entire record, including the briefs, affidavits, declarations and exhibits submitted by the parties, the transcripts of deponents, and the arguments of counsel, the Court finds and concludes as follows:

## I.

### MOTION TO RECONSIDER

■ 1. Reconsideration of an order denying summary judgment is proper under this Court's Local Rule 7.16, which permits reconsideration when there has been a change in the law.

■ 2. In *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257 (9th Cir.1983), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983), this Circuit for the first time determined the evidence that a plaintiff must show in order to overcome a defendant's motion for summary judgment in a case involving a distributor termination following dealer complaints. 709 F.2d 1257, 1262. It thus represents a change, or a clarification amounting to a change, in the law.

3. *Filco* was neither presented to nor considered by the Court in its prior ruling. The motion for summary judgment was originally filed in October of 1982, and argument was heard and the matter taken under submission on March 14, 1983. The Ninth Circuit rendered its decision in *Filco* on June 10, 1983; it was first published in the *Trade Regulation Reporter* on June 27; and Judge Marshall's Order was signed on July 8, 1983.

4. Defendant was in the process of bringing the *Filco* decision to the Court's attention at the time the Order was published. *See* Declaration of Kaye Washington in Support of Motion of Apple Computer Inc. for Reconsideration. Given the mails, the intervening holiday, and the time it necessarily takes to brief this kind of matter, and given the time-frame during which Judge Marshall's Order had necessarily been in preparation, *Filco* was not part of the Court's initial consideration of defendant's motion and this Court finds that there was no failure on the part of the moving party to be reasonably diligent in bringing that decision to the Court's attention.

5. In addition to *Filco*, there have been other significant changes in the law since Judge Marshall's Order was entered, further warranting reconsideration of the earlier ruling. In *Roesch, Inc. v. Star Cooler Corp.*, 712 F.2d 1235 (8th Cir.1983) the Eighth Circuit vacated its prior opinion. On rehearing *en banc* the court held that the manufacturer's termination of a dealer

following the receipt of complaints from the dealer's competitors was not per se unlawful. In so doing, the court both distinguished and denegrated the Ninth Circuit decision in *Girardi v. Gates Rubber Company Sales Division, Inc.*, 325 F.2d 196 (9th Cir.1963), upon which plaintiffs here also heavily relied. At the same time, the Eighth Circuit vacated its prior opinion in *Battle v. Watson*, 712 F.2d 1238 (8th Cir.1983), thereby affirming summary judgment for the manufacturer and adopting a rule contrary to that upon which plaintiffs here relied, which recognizes that termination following complaints by competitors of the terminated buyer are not sufficient to allow an inference of conspiracy. Finally, the Federal Trade Commission's order in *Russell Stover Candies*, which plaintiffs argued to Judge Marshall, was reversed by the Eighth Circuit on September 29, 1983. 1983–2 Trade Cases (CCH) ¶ 65,640 (8th Cir.1983).

In addition, the Ninth Circuit's opinion in *Cascade Cabinet Co. v. Western Cabinet & Millwork*, 710 F.2d 1366 (9th Cir.1983), which addresses the significance of a defendant's subjective intent in determining whether conduct is per se illegal, was rendered July 5, 1983. It, too, bears on the rationale of Judge Marshall's order.

6. Accordingly, the Court grants Apple's motion to reconsider on the ground that *Filco* represents a material difference in the law of this Circuit from that presented to the Court at the time of its earlier ruling; and that other authority cited to the Court has been significantly changed as well.[1]

---

1. Argument was heard on November 28, 1983. Defendant's motion for reconsideration and for summary judgment was granted from the bench in accordance with the court's written tentative ruling which was issued prior to argument and is part of the record. Proposed findings and conclusions were lodged by defendant December 21; plaintiff's response thereto was lodged January 13, 1984; and defendant's supplementary memorandum in support was filed on January 23. Regrettably both the calendar and circumstances beyond the Court's control prevented issuance of this memorandum until now.

Although the bases for this memorandum of decision are substantially the same as in the tentative, albeit greatly expanded in detail, the Court is aware of yet another, significant intervening decision, *Monsanto Company v. Spray-Rite Service Corporation*, —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Neither plaintiff nor defendant has in the meantime urged that *Monsanto* affects the court's rulings; nor do I believe that it does. However, as the Supreme Court's opinion does represent the most definitive statement on the sufficiency of evidence of complaints by other dealers to support a price-fixing conspiracy, this memorandum does take it into account where it appears appropriate to do so.

## II.

### SUMMARY JUDGMENT

The following facts are without genuine dispute:

*The Parties*

1. Apple was founded in 1976 and incorporated in California in early 1977. Carter Dec., Ex. A, at 4.

2. Since its inception, the company has been engaged in the design, development, production, marketing and servicing of small computer systems for individual and business applications. Carter Dec., Ex. A, at 4; Markkula Dec., Ex. A, at 3.

3. At the time of the initiation of this action, plaintiffs O.S.C. Corporation (also known as Olympic Sales Company), Consumer Computers, Advanced Computer Products, Custom Computers, Computer Specialties, and Micro Business World, Inc., were dealers authorized by Apple to sell its products from one or more retail locations. *See, e.g.*, Clardy Tr., p. 242, lines 17–20; Freeman Tr., p. 320, lines 5–9; Monroe Tr., p. 1116, lines 8–11; O'Donnell Tr., p. 1008, lines 1–18; Ravel Tr., Vol. II, p. 103, lines 6–12; p. 82, lines 11–13; DX 4; DX 312. In addition to selling to walk-in customers at authorized locations, these plaintiffs published catalogs and advertisements, soliciting mail and telephone order sales of Apple products from the consuming public. *See e.g.*, Ravel Tr., Vol. I, p. 177, line 9—p. 178, line 7; Vol. II, p. 250, line 11—p. 261, line 3; p. 185, line 21—p. 187, line 6; p. 258, line 24—p. 259, line 25; Ronen Tr., p. 83,

line 21—p. 84, line 8; p. 85, line 25—p. 86, line 2; p. 98, lines 10–12; p. 99, line 24—p. 100, line 1; Clardy Tr., p. 85, line 3—p. 86, line 11. Such sales are referred to as "mail order sales."

4. All of the plaintiffs carried other manufacturers' lines that competed with the Apple products they sold. *See, e.g.,* Freeman Tr., p. 69, lines 3–11; Monroe Tr., p. 570, lines 17—p. 573, line 24; p. 576, lines 19–24; O'Donnell Tr., p. 218, lines 1–2, 11–14; p. 809, line 25—p. 810, line 21; Ronen Tr., p. 18, lines 8–16; Ravel Tr., Vol. II, p. 105, lines 13–17; p. 104, lines 2–11; p. 96, lines 7–12; p. 94, lines 11–16; p. 82, lines 11–21; p. 78, line 21—p. 80, line 13.

*Relevant Product and Geographic Market*

5. The computer systems which Apple manufactures and sells are built around a central processing unit and include peripherals, operating software to control the system, and applications software to solve problems. Carter Dec., Ex. A, ¶ 5; Markkula Dec., Ex. A, at ¶¶ 4–8.

6. The company's principal computer system is based on the Apple II central processing unit, first introduced in 1977, which is packaged in a five-inch high, twelve-pound case. Carter Dec., Ex. A, at ¶ 6. The Apple II central processing unit is available in different memory sizes. In 1980, the company introduced the Apple III computer system. The Apple III includes a number of features which are optional accessories for the Apple II, as well as other features not available on the Apple II. Carter Dec., Ex. A, at ¶ 7.

7. Small computer systems are capable of hundreds of applications which vary in complexity and utility—applications such as producing budgets, maintaining business records, controlling inventory, word processing, performing complex pricing analysis, and so forth. Different applications require the computer system to consist of different components. Markkula Dec., Ex. A, at ¶ 8; O'Donnell Tr., p. 842, lines 14–22; Clardy Tr., p. 100, lines 2–8.

8. There are a wide variety of different brands and types of components from which consumers can select. Costs vary

considerably. Markkula Dec., Ex. A, at ¶¶ 4–7; Evans Tr., p. 327, lines 18–28; p. 328, lines 1–16; Ravel Tr., Vol. II, p. 82, line 11—p. 83, line 11; p. 124, lines 5–16; p. 130, lines 18–19; Vol. III, p. 93, line 15—p. 95, line 21; DX 2; Ronen Tr., p. 257, lines 15–22; Clardy Tr., p. 102, lines 5–10.

9. Various products manufactured by Apple's competitors are freely substitutable for Apple products. *See, e.g.,* Allen Tr., p. 119, line 12—p. 120, line 17; Clardy Tr., p. 523, line 18—p. 524, line 9, Monroe Tr., p. 555, lines 4–25; O'Donnell Tr., p. 1362, line 18—1363, line 7; Ravel Tr., Vol. II, p. 116, lines 3–18; Ravel Tr., Vol. III, p. 136, lines 2–6; Vol. V, p. 165, lines 10–16; Vol. VII, p. 131, lines 10–13, lines 23–25; Vol. VIII, p. 107, lines 8–11; Ronen Tr., p. 730, line 1—p. 731, line 21; p. 734, lines 12–17.

10. Some of these competitive products are cheaper than Apple's. *See, e.g.,* Clardy Tr., p. 102, line 5—p. 103, line 9; Ravel Tr., Vol. IV, p. 14, line 24—p. 15, line 9; Ravel Tr., Vol. VIII, p. 106, lines 14–21. Many are better suited than Apple products for specific purposes. *See* e.g., Clardy Tr., p. 94, line 14—p. 96, line 18; Monroe Tr., p. 88, lines 14–18; p. 498, lines 16–19; Ravel Tr., Vol. II, p. 112, lines 6–25; Ravel Tr., Vol. III, p. 95, lines 17–21; p. 135, lines 13–19.

11. One of the plaintiffs testified that he sold fully configured Apple computer systems for as much as $20,000. Ravel Tr., Vol. II, p. 236, lines 6–18. He also defined the market for microcomputer systems as ranging in price from $250 to more than $15,000. Ravel Tr., Vol. VIIA, p. 35, line 24—p. 36, line 3. Using Mr. Ravel's product market definition, Apple's expert witness determined that Apple had, at the time of the mail order prohibition, a market share of less than 6%. Rosen Dec., Ex. A, at ¶ 4. Although there is some suggestion that Apple's market share might be as large as twenty percent or more, Evans Tr., p. 498, lines 23–27; Carter Tr., p. 271, line 20—p. 272, line 2, no material dispute exists and the issue need not be resolved because, as plaintiffs admit, competition in

the market, however that term is defined, was intense prior to the mail order prohibition [see Paragraphs 13–15; Carter Dec., Ex. A, at ¶ 9; Markkula Dec., Ex. A, at ¶ 11; Rosen Dec., Ex. A, at ¶ 5; Evans Tr., p. 327, line 18—p. 330, line 11; M. Harris Tr., p. 453, line 5—p. 455, line 2] and became more intense after the mail order prohibition [see Paragraphs 21–51].

12. Plaintiffs considered every dealer in the United States as a competitor. *See e.g.,* Ravel Tr., Vol. II, p. 181, lines 7–16.

*Competition Prior to the Mail Order Prohibition*

13. Between the beginning of 1981 and the effective date of Apple's mail order prohibition, at least ten new manufacturers entered the market, including International Business Machines ("IBM") and Xerox. Rosen Dec., Ex. A, at ¶ 15; Evans Tr., p. 329, lines 4–12; p. 333, lines 7–10; O'Donnell Tr., p. 629, line 3—p. 630, line 14; Ronen Tr., p. 216, lines 17–20; p. 216, line 5—p. 217, line 2. There were, at the time of the mail order prohibition, more than 21 companies, all competing in the same market for the same consumer and business dollars. Rosen Dec., Ex. A, at ¶ 5; Carter Dec., Ex. A, at ¶ 9.

14. Many of the manufacturers of small computer systems had greater financial, marketing and technological resources than Apple; and the stronger competitors also had greater market penetration and name recognition for businessmen and professionals than did Apple. Carter Dec., Ex. A, at ¶ 11; Rosen Dec., Ex. A, at ¶ 6; Evans Tr., p. 331, lines 14–28; p. 332, line 16—p. 339, line 6; p. 339, line 6—p. 340, line 6; p. 440, lines 19–28; Simon Tr., p. 119, lines 5–25.

15. In addition, at the time of the mail order prohibition, a number of Apple's competitors had a sales and support capacity through company-owned facilities which permitted direct interface between the manufacturer and the ultimate consumer. Rosen Dec., Ex. A, ¶ 6; Carter Dec., Ex. A, ¶ 11; Evans Tr., p. 440, lines 12–14; Carter Tr., p. 271, lines 3–8.

*Apple's Independent Dealer Network*

16. Apple did not have at the time of the mail order prohibition, and does not now have, a similar company-owned network. Consequently, Apple has depended entirely upon independent dealers to provide an interface with the consumer and to provide support for the sale of Apple products. Markkula Dec., Ex. A, at ¶¶ 4–9; Rosen Dec., Ex. A, at ¶ 6.

17. Apple began to develop a network of independent local retail outlets in 1977. At the time of the mail order prohibition, Apple products were sold in the United States through approximately 1,000 independent outlets. These were generally computer stores ranging from sole proprietorships to franchisees of retail chains. These stores typically handled a variety of computer-related products, including computer systems manufactured by Apple's competitors. Apple itself owned no retail outlets. Carter Dec., Ex. A, at ¶ 17.

17. Each dealer of Apple products in the United States, including the six plaintiffs in this case, executed an Authorized Apple Dealer Sales Agreement ("Dealer Agreement"). These agreements have no fixed term, but expressly provide for termination by either party on 30 days' notice. The Dealer Agreement does not restrict a dealer to a particular sales territory, but it does provide that a dealer may make sales only from locations approved by Apple. Carter Dec., Ex. A, ¶¶ 19, 20; Carter Tr., p. 22, lines 6–17; DX 54; DX 151; DX 166; DX 167; DX 231; DX 232; O'Donnell Tr., p. 1008, lines 8–11; DX 213; DX 311; DX 312; Freeman Tr., p. 320, lines 5–9.

18. Since they provide the only interface between Apple and the purchasers of its products, Apple is wholly dependent on the business vitality of its independent dealers, their goodwill, and their commitment vigorously to promote and support the sale of Apple products. O'Donnell Tr., p. 681, line 21—p. 682, line 5; Monroe Tr., p. 951, lines 9–20; Rosen Dec., Ex. A, at ¶ 9; Rogers Dec. at ¶ 3.

19. In June of 1981, Apple formed a "Dealer Advisory Council" as a mechanism

by which to gain information about the marketing of small computer systems. Carter Tr., p. 88, lines 2–4, 8–15; Ronen Tr., p. 569, lines 6–10; Rogers Dec. at ¶ 8.

*Support and Free-Riding*

20. From the inception of the company, Apple's sales and marketing strategy has been directed toward less technically-oriented individuals and businessmen who have need for a computer, but have little or no knowledge as to how a computer might help solve their problems. Carter Dec., Ex. A, at ¶ 13; Evans Tr., p. 367, lines 5–28; Miller Dec. at ¶ 3. It is Apple's position that its success depends upon educating these potential customers to the operation and application of small computers and persuading nontechnical persons that they can, with the proper help, learn to program and operate such a device. Carter Dec., Ex. A, at ¶ 13; Markkula Dec., Ex. A, at ¶¶ 18, 23.

21. This requires sales "support" consisting of assessing the needs of prospective customers; assembling the particular configuration purchased by the consumer; hands-on instruction, education and training; and being so situated as to enable the purchaser to come back to the seller when the purchaser has a problem. Markkula Dec., Ex. A, ¶¶ 4, 7 and 8; Carter Dec., Ex. A, ¶¶ 14, 15; Evans Tr., p. 380, line 21—p. 381, line 28; M. Harris Tr., p. 666, line 15—p. 667, line 6; p. 347, lines 8–24; p. 348, lines 15–28; p. 349, lines 1–3; Carter Tr., p. 116, lines 21–23; Monroe Tr., p. 637, line 18—p. 638, line 10; O'Donnell Tr., p. 296, line 12—p. 297, line 15; Allen Tr., p. 136, lines 14–25; DiLillo Tr., p. 401, line 12—p. 402, line 2; Rosen Dec., Ex. A, at ¶ 10.

22. A manufacturer in this industry has a vital interest in seeing to it that its products are properly supported, *see e.g.,* Allen Tr., p. 461, lines 7–11; Ravel Tr., Vol. VI, p. 170, line 22—p. 171, line 1; O'Donnell Tr., p. 124, lines 13–20; p. 1365, line 14—p. 1366, line 4; Allen Tr., p. 54, lines 3–12, and several of Apple's larger competitors have

sales and support networks in place to guarantee that sales of their small computer products are properly supported. Carter Dec., Ex. A, ¶ 16; Rosen Dec., Ex. A, at ¶ 8; *see also,* Allen Tr., p. 261, lines 3–22.

23. It is Apple's position that manufacturers which are successful in providing pre- and post-sale support for their small computer products will have a substantial marketing advantage over those whose support is inadequate. Apple therefore provides more training, seminars, education and general support for the independent dealer than any other manufacturer. *See e.g.,* Ravel Tr., Vol. II, p. 242, line 25—p. 243, line 14; Monroe Tr., p. 612, line 20—p. 613, line 11. *See also* Simon Tr., p. 126, line 16—p. 129, line 18.

24. Apple has taken the position that mail order sales are, by definition, not fully supported.[2] Carter Dec., Ex. A, at 27; Carter Tr., p. 114, lines 14–21; p. 117, line 27—p. 118, line 12; Bowman Tr., p. 87, line 24—p. 88, line 8. In its view the mail order dealer is either indifferent to the fact that consumers purchasing by mail have little or no support, or counts on other dealers to provide that support. Carter Dec., Ex. A, at ¶ 27; Markkula Dec., Ex. A, ¶ 25; Carter Tr., p. 60, lines 3–13.

25. Plaintiffs concede that most customers shop at other dealerships before contacting their mail order operations. Allen Tr., p. 145, line 17—p. 146, line 16; Monroe Tr., p. 494, lines 9–14. Plaintiffs also admit that it is not possible over the telephone to assess the needs of a person who is not technically oriented, nor is it possible to teach such a person to use software or peripherals. O'Donnell Tr., p. 843, line 15 —p. 844, line 7; Ronen Tr., p. 877, lines 3–18; p. 282, line 19—p. 283, line 1; p. 284, line 15—p. 285, line 15; p. 288, lines 17–25. While all plaintiffs provide a high level of face-to-face support to walk-in customers, no such support was available to mail order purchasers. *See e.g.,* Allen Tr., p. 171, lines 4–19; Carter Tr., p. 135, lines 14–23;

---

**2.** Moreover, Apple has never been interested in offering its products for sale through mail order for the reason that the company was striving to sell computers to ordinary consumers as compared with hobbyists. Miller Dec., Ex. 3.

Monroe Tr., p. 446, line 12—p. 147, line 1; p. 636, lines 2-12; p. 655, lines 5-11; O'Donnell Tr., p. 428, line 22—p. 429, line 10; p. 897, line 15—p. 898, line 24; Ravel Tr., Vol. III, p. 95, line 22—p. 96, line 23; Vol. III, p. 93, line 20—p. 94, line 1; Ronen Tr., p. 749, line 11—p. 757, line 3.

26. Plaintiffs routinely spent more time with walk-in customers than with mail order customers; *compare,* Ronen Tr., p. 757, line 4—p. 758, line 6 *with* Ronen Tr., p. 759, line 4—p. 760, line 7; *compare* O'Donnell Tr., p. 931, lines 9-15 *with* O'Donnell Tr., p. 932, lines 4-10; and routinely sent mail order customers seeking information to other dealers rather than attempting to instruct and support them over the telephone or via the mail. *See e.g.,* Allen Tr., p. 166, line 19—p. 168, line 16; Monroe Tr., p. 1023, line 12—p. 1025, line 15; Ravel Tr., Vol. III, p. 116, lines 12-20; Vol. III, p. 162, lines 8-13.

27. Apple undertook to have an independent market survey performed to determine dealers' costs of support for Apple products. The results of this research demonstrated that the dealer who provides proper support for each sale incurs considerably higher costs than a dealer who does not. Rosen Dec., Ex. A, at ¶ 11; Carter Dec., Ex. B, at ¶ 14; Carter Dec. at ¶ 31; Markkula Dec., Ex. A, at ¶ 13; Carter Tr., p. 135, lines 9-19; p. 138, line 6—p. 139, line 5. Because their overhead is so much less, mail order dealers have a competitive advantage over full-support dealers. *See e.g.,* Allen Tr., p. 174, lines 10-18; p. 249, line 18—p. 250, line 23; Monroe Tr., p. 472, line 28—p. 473, line 1; O'Donnell Tr., p. 649, lines 7-14; p. 1256, lines 13-17.

28. It appeared to Apple that full-support dealers would not continue to provide support if to do so simply increased their costs and put them at a competitive disadvantage in the marketplace. Apple therefore concluded that it must require each of its dealers to provide support; otherwise none would, and Apple would in turn be competitively disadvantaged vis-a-vis large companies with the in-house capability of providing support. Rosen Dec., Ex. A, at

¶ 11; Carter Dec., Ex. A, at ¶ 25; Evans Tr., p. 390, line 17—p. 391, line 18; M. Harris Tr., p. 448, line 26—p. 449, line 10.

*The Mail Order Prohibition and Other Support Programs*

29. End-user complaints about the lack of support on mail order sales began to increase in the late 1970's, before plaintiffs began selling Apple products. Bowman Tr., p. 62, line 26—p. 63, line 7; p. 80, line 25—p. 81, line 14.

30. Apple has taken numerous steps to assure support for its products. Among others, in early 1980, it created the "Apple Means Business" program to train dealers to deliver support in order to ease the transition from the hobbyist to the business market. Evans Tr., p. 458, line 21—p. 460, line 23; DiLillo Tr., p. 270, lines 23-28. Later in the same year, Apple terminated all of its distributors nationwide, and took over distribution itself, for the express purpose of supporting the product. Carter Tr., p. 280, line 27—p. 281, line 7.

At the end of 1980, Apple developed and promulgated Level 1 Service Center concept, which was a program with training for dealers so that they could provide consumers with one-day repair on Apple products. Level 1 Service was made mandatory for all dealers in mid-1982. Carter Dec., Ex. A, at ¶ 26. Such "turnaround" is impossible for a mail order dealer. *See e.g.,* Evans Tr., p. 354, line 27—p. 355, line 27; M. Harris Tr., p. 339, line 14—p. 340, line 8; p. 675, lines 1-8.

Apple also instituted a National Accounts program so that the company's independent dealers could compete for the business of large corporations which have many dispersed locations throughout the country. Without a program of this type, Apple and its dealers would lose the business of these corporations to larger competitors, which have the capacity to provide education, training, user-support, and service that are beyond the capability of Apple or its authorized dealers individually. *See e.g.,* Roebuck Dec. at ¶¶ 3, 5; Bowman Tr., p. 107, lines 21-27.

31. Plaintiffs were aware of Apple's concern about the lack of support provided by mail order sales. O'Donnell Tr., p. 74, line 21—p. 75, line 12; p. 102, line 25—p. 103, line 8; p. 100, lines 9–16; DiLillo Tr., p. 87, line 16—p. 88, line 9; M. Harris Tr., p. 542, line 17—p. 543, line 1; DX 321.[3]

32. Apple confirmed the basis of its concerns with a formal investigation, consisting of three steps: identifying the scope of the problem; determining support costs borne by full-support dealers on which mail order dealers were "free-riding"; and securing the services of an independent industry analyst to evaluate the effect of continued mail order sales on Apple's business. Carter Dec., Ex. A, at ¶ 28; Markkula Dec., Ex. A, at ¶ 9; Carter Tr., p. 135, line 9—p. 136, line 7; p. 137, line 23—p. 138, line 5.

33. Apple determined the extent to which its products were being mail ordered by first canvassing its national sales force for the names of dealers selling mail order, and second, reviewing national magazines to identify those dealers advertising the mail order sale of products. Carter Dec., Ex. A, at ¶ 29.

34. Apple employees, without disclosing their company affiliation, then attempted to order Apple computers by mail from each dealer identified in this manner. Those dealers who accepted the order were considered to be engaging in the mail order sale of Apple products. This investigation revealed that only 31 dealers with 69 authorized locations were selling Apple products by mail order. Prices charged by those dealers for the mail order sale of an Apple computer ranged from a low of about 10% above the dealers' cost to a high of the full suggested retail price, $1,079—$1,530. Carter Dec., Ex. A, at ¶ 29.

35. Apple employees also walked into an authorized location of each of these mail order dealers and secured price quotations for the same Apple computer as part of a face-to-face transaction. This walk-in shopping revealed that many of the mail order dealers charged less for the same Apple computer sold mail order than if it were purchased from the same dealer as part of a face-to-face transaction. Nevertheless, prices for a face-to-face purchase of the same computer previously purchased mail order ranged from a price below the lowest price quoted for mail order to a high of the suggested retail price, $1,055 to $1,530. Carter Dec., Ex. A, at ¶ 30.

36. Apple retained a survey sampling and consulting firm with extensive experience in the small computer industry to determine the support costs borne by non-mail order dealers. Carter Tr., p. 135, lines 9–19. That market survey, which was conducted according to accepted survey sampling techniques, confirmed that dealers who did not engage in the mail order sale of Apple products spent approximately 13% of their gross revenues and roughly $\frac{1}{3}$ to $\frac{1}{2}$ of their total operating margins on costs associated with support in the face-to-face sale of small computer products. Carter Tr., p. 138, line 6—p. 139, line 5; Carter Dec., Ex. A, at ¶ 31; Burwen Aff. at ¶ 14 and Ex. C.

37. Apple also retained a nationally recognized industry analyst to assist the company in evaluating the market research report and the company's tentative conclusions regarding mail order, and to advise the company on a future course of action. Carter Tr., p. 140, line 20—p. 141, line 43.

38. After reviewing the report and considering Apple's position in the industry, the independent analyst advised the company that mail order sales had an erosive effect on Apple's dealer base and were inimical to Apple's ability to compete in the small computer market. The analyst recommended that Apple cease doing business with dealers who engage in the mail order sale of Apple products. Carter Dec., Ex. A, at ¶ 32; Rosen Dec., Ex. A, at ¶¶ 16–18.

**3.** Although plaintiffs raise as an issue of fact Apple's "consent and encouragement" to mail order sales [Issue No. 3], the dispute does not require trial to be resolved in light of plaintiffs' admissions.

39. Apple's Vice President-Sales presented the results of the consulting firm's study and the analyst's conclusions to the Apple Board of Directors, which adopted the mail order prohibition. Carter Tr., p. 138, line 6—p. 140, line 2; p. 156, line 19—p. 157, line 19; p. 186, line 20—p. 187, line 12.

40. In early November of 1981, Apple mailed all of its dealers Modifications of their Dealer Agreements and letters setting forth Apple's new policy. Carter Tr., p. 21, lines 24-27. The letter stated that every dealer who desired to remain an authorized Apple dealer would be required to agree, by signing the Modification, that he would not engage in the mail order sale of Apple products; that every dealer who returned a signed Modification by November 20, 1981 would continue to be an authorized Apple dealer; and that those who did not would be assumed to have decided to terminate their relationships with Apple, effective December 4, 1981. Carter Tr., p. 19, lines 2-23; Carter Dec., Ex. A, ¶¶ 34-35; DX 51.

41. The program was implemented as stated in the letter. Every dealer who signed the Modification continued as an authorized Apple dealer, regardless of any other factor, including the price charged by that dealer and whether the dealer previously engaged in the mail order sale of Apple products. Carter Dec., Ex. A, at ¶ 36. All of the dealers identified as engaging in mail order sales, including the six plaintiffs, returned signed Modifications. Carter Dec., Ex. A, at ¶¶ 37-38; Ravel Tr., Vol. VI, p. 227, line 23—p. 228, line 22; Allen Tr., p. 398, lines 18-24; Monroe Tr., p. 329, line 14—p. 331, line 4; O'Donnell Tr., p. 447, line 7—p. 480, line 14; Freeman Tr., p. 338, line 23—p. 339, line 12; Ronen Tr., p. 307, lines 17-23; Clardy Tr., p. 169, line 16—p. 170, line 19; p. 358, lines 12-18.

42. Because the plaintiffs all returned signed Modifications to Apple, they were permitted, until the initiation of these proceedings, to continue purchasing Apple products on the same basis as before November 2, 1981. *See e.g.,* Allen Tr., p. 398, lines 18-21; Freeman Tr., p. 309, lines 15-20; p. 444, line 17—p. 445, line 4; O'Donnell Tr., p. 475, line 9—p. 476, line 13; Ronen Tr., p. 1001, line 11—p. 1002, line 7; Ravel Tr., Vol. VII, p. 8, line 11—p. 10, line 17; Goff Dec. at ¶ 3. Several of the plaintiffs continued to sell Apple products mail order. Ravel Tr., Vol. VI, p. 211, line 33—p. 213, line 1; Allen Tr., p. 398, line 6—p. 399, line 15; O'Donnell Tr., p. 480, line 17—p. 481, line 12; Monroe Tr., p. 339, line 2—p. 340, line 6; p. 88, line 19—p. 89, line 11; Clardy Tr., p. 481, lines 23-25; Carter Tr., p. 30, lines 7-12.

43. In January of 1982, Apple published guidelines in the Apple dealer newsletter relating to details of the mail order prohibition, emphasizing the need for face-to-face instruction and supervised, "hands-on" computer experience with each sale. Carter Dec., Ex. C.

44. In early 1982, Apple began internally to monitor compliance with its mail order prohibition, using the same procedure originally employed in identifying the 31 dealers who engaged in the mail order sale of Apple products prior to the mail order prohibition. Apple shoppers attempted to mail order an Apple II Plus 48K computer from each dealer identified as engaging in mail order sales. Carter Dec., ¶ 19; Carter Tr., p. 38, line 24—p. 39, line 17.

45. Of the dealers so identified, only eight responded to shoppers by offering to sell an Apple computer via mail order. These eight dealers were terminated by Apple for violating the mail order prohibition. Carter Tr., p. 38, line 29—p. 39, line 20. One of these terminated dealers charged the Apple shopper $1,530, the full suggested retail price, for the computer sold mail order. A second of these dealers charged the Apple shopper $1,500. Among the dealers terminated for selling mail order were two of the plaintiffs, Olympic Sales and Customer Computer. Carter Tr., p. 29, line 28—p. 30, line 12; p. 30, line 22—p. 31, line 2.

46. In late January, 1982, Apple terminated its business relationship with plaintiff Micro Business World because of Micro

Business World's failure to pay for more than $200,000 worth of merchandise it ordered from Apple. Carter Tr., p. 32, lines 10–25. Apple has initiated a lawsuit in state court to collect the amounts outstanding. Carter Dec. ¶¶ 18–20.

47. In March of 1982 Apple terminated plaintiff Consumer Computer because it sent a letter to potential Apple customers urging them to purchase other products instead, DX 19; Monroe Tr., p. 1116, lines 7–11, in violation of its dealer agreement. DX 211; Carter Dec. ¶ 21.

48. Two of the plaintiffs have never been terminated as Apple dealers. *E.g.,* Freeman Tr., p. 444, line 17—p. 445, line 4.[4]

*Market Conditions After the Prohibition*

49. At the time of its summary judgment motion, Apple had approximately 200 more dealerships nationwide than it did at the time of announcing the mail order prohibition. There were also more Apple dealerships in Southern California at the time of the summary judgment motion than there were in November of 1981. Carter Dec. at ¶ 25.

50. Competition was keener on the dealer level after the mail order prohibition than before. Allen Tr., p. 200, line 24—p. 201, line 1; Clardy Tr., p. 149, line 20—p. 150, line 7; Monroe Tr., p. 656, lines 9–11; O'Donnell Tr., p. 970, lines 15–18; Ronen Tr., p. 829, lines 6–9; Simon Tr., p. 116, lines 7–23; p. 122, line 19—p. 123, line 4; Evans Tr., p. 327, line 18—p. 128, line 3; DiLillo Tr., p. 286, line 15—p. 287, line 14.

51. After the mail order prohibition, the small computer market became increasingly competitive. As of the Spring of 1982, more than 57 companies offered for sale more than 100 different personal computers. At the time of Apple's summary judgment motion, the market contained 2–3 times as many competitors as it did when Apple announced its mail order prohibition. Rosen Dec. at ¶ 4; Carter Dec. at ¶ 3.

52. Plaintiffs, as well as other Apple dealers, were advertising and charging less for Apple products after the mail order prohibition than prior to it. *Compare* DX 245 *with* DX 242 (Consumer Computers); *compare* DX 271 *with* DX 225 (Computer Specialties); Freeman Tr., p. 72, line 24—p. 75, line 23; DX 285; DX 275; DX 284 (Advanced Computer Products); *see also* DX 272; Simon Tr., p. 124, lines 17–25; Burwen Dec. at ¶ 17.[5]

*Vertical Price Fixing Allegations*

53. Apple published a written price list suggesting the price at which Apple products be resold to consumers, and distributed this list to each of its retail dealers.

54. Apple's policy of permitting dealers to set their own retail prices is set forth in the Dealer Agreement. The Agreement also obligates the dealer to report to Apple any attempts by anyone to tell the dealer the resale prices to charge for Apple products or any attempt to inhibit the dealer's pricing discretion with respect to those products. Apple has never received a report that dealer pricing discretion was inhibited in any manner. *See e.g.,* Carter Dec., Ex. A ¶ 21; Monroe Tr., p. 207, line 10—p. 209, line 9; DX 4.

55. Plaintiffs testified that their prices for Apple products were set in response to competitive pressures such as what the market would bear, and what their competi-

**4.** In the spring of 1982, Apple terminated its corporate sales agreement with the world's largest franchisor of computer stores, Computerland Corporation, because Computerland would not give Apple the right to designate by location the Computerland franchisees entitled to carry Apple products. Carter Dec. at ¶ 24.

**5.** Although plaintiffs cite an Apple regional sales manager to the effect that prices advertised in the Los Angeles area for Apple products rose for a few months following the mail order prohibition, DiLillo Tr., p. 271, line 21—p. 273, line 27,

this testimony was, according to the witness, based only on looking at newspapers in a random fashion, DiLillo Tr., p. 273, lines 18–27, and is therefore not admissible. F.R.E. Rule 702. Regardless, it is not material because the mail order prohibition would have had minimal, if any, effect on prices in the Los Angeles market, since, even under plaintiffs' view of the case, the principal mail order distributors were located in that market. In any event, dealers were still advertising at discounted prices, without interference from Apple.

tors were charging, etc. Allen Tr., p. 206, line 14—p. 207, line 9; Clardy Tr., p. 61, line 13—p. 62, line 14; Monroe Tr., p. 539, line 22—p. 542, line 1; O'Donnell Tr., p. 309, lines 11–13; p. 308, lines 8–15; Ravel Tr., Vol. II, p. 140, lines 1–9; Ronen Tr., p. 142, line 19—p. 143, line 18; p. 144, line 1—p. 145, line 20; p. 191, line 22—p. 193, line 8. Not one plaintiff claimed that he set his price based on anything Apple told him. *See e.g.*, Monroe Tr., p. 342, line 7–10; Ravel Tr., Vol. IV, p. 149, lines 3–6; O'Donnell Tr., p. 161, lines 4–18; Clardy Tr., p. 268, lines 4–15. None of the plaintiffs claims that he was told that he had to sell Apple products at any particular price or price level. *See e.g.*, Ronen Tr., p. 389, line 6—p. 390, line 13; O'Donnell Tr., p. 157, line 23—p. 158, line 7; Allen Tr., p. 296, line 20—p. 297, line 11; Carter Tr., p. 54, line 20—p. 56, line 27.

56. Apple never did anything about "discounting" by its dealers, whether responsive to competitors' complaints or not. No dealer was ever told the price for which he was to sell Apple products; no dealer was ever threatened with termination for discounting; and no dealer was ever terminated because of discounting. *See e.g.*, C. Harris Tr., p. 72, line 28—p. 73, line 3; M. Harris Tr., p. 512, lines 2–12; M. Harris Tr., p. 505, lines 21–23; p. 94, lines 24–27; O'Donnell Tr., p. 161, lines 16–18. There is no evidence of any systematic policy of refusing to deal with price-cutters.

57. Under Apple's cooperative advertising program, dealers were compensated for advertising regardless of the price in their ads. DiLillo Tr., p. 364, line 26—p. 365, line 3; p. 387, lines 22–26; Ravel Tr., Vol. III, p. 41, line 9—p. 42, line 25; Monroe Tr., p. 872, line 25—p. 873, line 3; Evans Tr., p. 442, lines 9–21; M. Harris Tr., p. 512, line 27—p. 513, line 22; p. 514, lines 21–27.

58. Both prior to and after the mail order prohibition there were dealers, including dealers in the same marketing area as the plaintiffs, who sold Apple products in face-to-face supported sales at prices lower than the plaintiffs sold the same products via mail order. Monroe Tr., p.

929, lines 15–20; O'Donnell Tr., p. 310, lines 11–15; Freeman Tr., p. 175, line 16—p. 176, line 12; Ronen Tr., p. 76, lines 17–23; p. 705, lines 6–8; p. 465, lines 7–10; Carter Dec., Ex. A, at ¶ 30; DX 20; DX 38–5; *see also* Ronen Tr., p. 705, lines 6–11; p. 1067, lines 22–25; O'Donnell Tr., p. 354, line 21—p. 355, line 3; p. 1319, lines 2–10.

59. There is no substantial evidence that "discounting" and mail order were one and the same. To the contrary, full support dealers "discounted" before and after the mail order prohibition, DiLillo Tr., p. 233, line 1—p. 236, line 6, and some mail order dealers advertised below suggested retail while others did not. Carter Tr., p. 54, line 20—p. 55, line 22; p. 56, lines 11–23.

60. Plaintiffs concede that after the mail order prohibition, as before, they were free to sell to any customer, in any territory, at any price so long as the sale was fully supported in a face-to-face manner. Clardy Tr., p. 333, lines 16–20; Monroe Tr., p. 900, lines 10–17; Ronen Tr., p. 1001, line 11—p. 1002, line 7; O'Donnell Tr., p. 356, lines 4–10; Ravel Tr., Vol. VII, p. 10, lines 3–17.

61. "Discounting" also continued unabated after the mail order prohibition, *see e.g.*, DX 272; Ravel Tr., Vol. VIIA, p. 86, lines 3–8; O'Donnell Tr., p. 354, line 21—p. 355, line 3, including specifically by one of the plaintiffs, Advanced Computer Products. *See e.g.*, DX 275, DX 284; Freeman Tr., p. 444, line 17—p. 445, line 40; *see also* Evans Tr., p. 405, lines 16–25; p. 451, line 27—p. 452, line 9; Simon Tr., p. 135, lines 18–25; M. Harris Tr., p. 693, lines 24–27.

62. Apple did not involve its dealers in the investigation, initiation, implementation, policing or enforcement of its mail order policy.

*Apple's "Intent"*

63. In addition to citing evidence of statements to dealers concerning pricing, plaintiffs also cite testimony of Apple's "subjective intent" in promulgating the mail order prohibition. Accepting plaintiffs' version of disputed events as true,

and fully crediting all admissible testimony proffered by plaintiffs, it is clear in context that any concern Apple may have had about "price" or "market erosion" pertained to the dealers' capacity to withstand erosion of their profit margins caused by having to provide local support to purchasers of mail order systems ("free riding"), and not to the retail price charged by any dealer whether selling face-to-face or by mail order.

64. The need to support the product stemmed from apple's concern about its ability to compete against much larger rivals in the personal computer market, M. Harris Tr., p. 452, line 17—p. 453, line 17; p. 456, line 8—p. 457, line 27; p. 679, lines 19–28; DiLillo Tr., p. 377, line 18—p. 378, line 22.

65. Apple's conclusion that mail order sales were inherently unsupported was neither unreasonable nor insincere. Simon Tr., p. 125, line 11—p. 127, line 22; p. 133, line 22—p. 134, line 3; p. 141, line 6—p. 142, line 18; Evans Tr., p. 344, lines 6–13; p. 382, lines 1–21; p. 388, line 11—p. 389, line 21; p. 435, lines 15–19; *see e.g.*, Carter Tr., p. 43, lines 13–16.

66. The need for support was Apple's articulated reason for the mail order prohibition. *See e.g.*, Carter Tr., p. 43, lines 13–16.

*Dealer Conspiracy*

67. Plaintiffs selected the alleged co-conspirators identified in the complaint because they had complained to Apple about free-riding mail order sales, for example, Computerland, Ravel Tr., Vol. VII, p. 80, lines 15–24; Vol. VI, p. 198, line 16—p. 199, line 6; Monroe Tr., p. 986, line 19—p. 987, line 2; Clardy Tr., p. 418, line 3—p. 419, line 23; O'Donnell Tr., p. 316, lines 17–25; p. 318, lines 2–3, or because they were members of Apple's Dealer Advisory Council, Clardy Tr., p. 422, line 1—p. 423, line 2; Ronen Tr., p. 443, line 1—p. 446, line 24; Monroe Tr., p. 985, lines 1–13; Ravel Tr., Vol. VI, p. 202, line 2—p. 204, line 8; Allen Tr., p. 430, lines 16–21.

68. However, plaintiffs acknowledge that except for the presence of complaints, they have no evidence that Apple engaged in a conspiracy with the alleged co-conspirators in prohibiting mail order sales.[6] Monroe Tr., p. 986, line 19—p. 987, line 2; Allen Tr., p. 458, line 5—p. 459, line 7; p. 430, lines 16–21; Clardy Tr., p. 438, line 24—p. 439, line 16; O'Donnell Tr., p. 324, lines 2–6; p. 372, lines 12–22; p. 316, lines 17–25; p. 318, lines 2–6, 9–13; Ravel Tr., Vol. VII, p. 84, lines 12–22; p. 84, line 23—p. 86, line 15; p. 93, line 25—p. 94, line 5; Ronen Tr., p. 561, line 25—p. 563, line 4; Allen Tr., p. 501, line 19—p. 502, line 6; O'Donnell Tr., p. 1317, lines 16–19.

69. Plaintiffs also acknowledge that they can point to no facts to show that complaints concerning price cutting and mail order were aired at Council meetings.[7] Allen Tr., p. 501, line 19—p. 502, line 6; Clardy Tr., p. 418–19, 422–23, 438, line 24—p. 439, line 16; O'Donnell Tr., p. 372, 1317, lines 16–19; Ravel Tr., Vol. VII, p. 92, lines 5–8; Ronen Tr., p. 561, line 22—p. 563, line 19; Ronen Tr., p. 567, line 6—p. 570, line 16; Allen Tr., p. 501, line 19—p. 502, line 6. The only substantial evidence is to the contrary. Simon Tr., p. 42–44, 111–12.

---

**6.** Plaintiffs assert that because of retailer Computerland's importance to defendant in terms of sales volume, Computerland was to pressure defendant into prohibiting mail order sales. Plaintiffs' Reply Memo, line 8, page 27. There is evidence that Computerland launched a letter-writing campaign complaining about mail order sales, Clardy Tr., p. 419–20, but no evidence that defendant and Computerland agreed to fix or stabilize prices. Ronen Tr., p. 561–562; Ravel Tr., p. 84; O'Donnell Tr., pp. 316, 318. Moreover, shortly after the mail order prohibition, Apple terminated its business relationship with Computerland Corporation. *See* Carter Dec. at ¶ 24.

**7.** Although they allege that demands for joint action were made in Apple's Dealer Advisory Council, plaintiffs admitted that they had no evidence that dealer pricing issues or mail order complaints were ever aired at the Dealer Council. The testimony of those present at the council, including an independent dealer, confirmed that such issues were never discussed. *See* Simon Tr., p. 42, line 26—p. 44, line 9; p. 111, line 16—p. 112, line 18.

70. Apple's in-house counsel disseminated written "ground rules" at the beginning of each session of the Dealer Council, forbidding discussion of pricing and mail order issues before, at or after meetings of the Council; and made the first oral presentation at each meeting, stressing these rules. *See* Simon Tr., p. 42, line 26—p. 44, line 9; p. 111, line 16—p. 112, line 18; DX 819 (ground rules for June 1981 Council meeting); DX 823 (ground rules for September 1981 Dealer Council meeting).

71. Apple received voluminous complaints from its dealers about a myriad of subjects, including the prices at which dealers sold Apple products, "free-riding" by mail order dealers, low price mail order advertisements, and every other aspect of the relationship between Apple and its dealers. Evans Tr., p. 394, line 27—p. 395, line 8; M. Harris Tr., p. 478, line 25—p. 480, line 10; DiLillo Tr., p. 335, lines 6–7; Carter Tr., p. 93, lines 2–4; DiLillo Tr., p. 335, lines 2–3; M. Harris Tr., p. 484, lines 21–25; Carter Tr., p. 92, line 25—p. 93, line 4.

72. Virtually every dealer at one time or another complained about another dealer's pricing. DiLillo Tr., p. 335, lines 2–3. Even the plaintiffs in this action complained about other dealers' prices. Evans Tr., p. 395, lines 18–20; M. Harris Tr., p. 229, lines 20–27; p. 491, line 19—p. 492, line 2; Monroe Tr., p. 493; lines 10–12; p. 964, line 21—p. 965, line 22; p. 1135, line 14—p. 1137, line 11; Monroe Tr., p. 961, line 12—p. 962, line 5; DX 38; DX 33.

73. Both discounting and dealer pricing complaints continued after the mail order prohibition was implemented. M. Harris Tr., p. 488, line 21—p. 489, line 8; Evans Tr., p. 369, line 10—p. 370, line 2.

74. Apple responded to price complaints by telling the complaining dealer there was nothing it could or would do. Evans Tr., p. 375, line 13—p. 376, line 5; Simon Tr., p. 44, lines 14–27; p. 140, line 28—p. 141, line 5; DiLillo Tr., p. 380, line 19—p. 381, line 19; p. 398, line 12—p. 399, line 10; p. 422, line 19—p. 423, line 4; p. 396, line 14—p. 397, line 20; Ronen Tr., p. 112, lines 4–14;

p. 132, line 19—p. 133, line 4; Simon Tr., p. 158, lines 4–12.

Plaintiffs make the following contentions with respect to which there is no substantial support in the record:

(A) That they have produced evidence that Apple, for the purpose of eliminating mail order discount price advertising to coerce mail order houses into eliminating discount price advertising and to "get their prices up," actually threatened the plaintiffs with retaliatory action. Plaintiffs' Reply Memo at p. 27, line 19. However, plaintiff O'Donnell of Customer Computer testified to the contrary, O'Donnell Tr., Vol. I, p. 158–61, and there is no substantial evidence otherwise. *See e.g.,* Clardy Tr., Vol. III, p. 274–92; Monroe Tr., Vol. I, p. 208–12. Plaintiffs themselves characterize Apple statements about prices and advertisements as "suggestions" in the form of "advice" which was not followed, O'Donnell Tr., p. 161, lines 4–18; p. 163, lines 7–25; Allen Tr., p. 357, lines 3–6; and concede that Apple made no threats of termination. O'Donnell Tr., p. 161, lines 16–18; Ravel Tr., p. 149.

(B) That the granting of additional authorized locations for two of the plaintiffs was conditioned on their either removing prices from advertisements or ceasing to discount Apple products. However, with respect to the former, the dealer declined to follow Apple's alleged advice, Clardy Tr., p. 268, lines 4–15, was nevertheless granted a new location, Clardy Tr., p. 189, lines 11–19; p. 33, line 11—p. 34, line 2, and continued to advertise prices for Apple products through the entire period. *See* DX 243–A; DX 244–B; DX 245–B; DX 246–B; DX 247–D; DX 248–C; DX 156; DX 242; DX 240–B; DX 160. With respect to the latter assertion, the plaintiff in question was awarded the new location. Freeman Tr., p. 26, lines 2–5, from which he continues to discount the sale of Apple products, Freeman Tr., p. 365, lines 11–22.

(C) That an Apple employee attended a price-fixing meeting. The record indicates that the individual in question was a representative of an independent distributor, M.

Harris Tr., p. 87, line 12—p. 88, line 21, and all parties concede that nothing came of the discussion. M. Harris Tr., p. 508, line 17—p. 509, line 16; Monroe Tr., p. 175, lines 18–20.

(D) That Apple agreed with one of the plaintiffs not to advertise prices. The record indicates that Apple repeatedly informed the dealer in question, both orally and in writing, that he could advertise price, Ravel Tr., Vol. V, p. 45, lines 9–14; DX 26, and that he in fact did so, Ravel Tr., Vol. II, p. 213, lines 8–14; p. 227, lines 11–15.

Other issues raised in plaintiffs' statement of genuine issues but which are either not genuinely in dispute or do not pertain to a material fact, include:

(A) That Apple knew that an agreement or combination to eliminate price competition was unlawful. [Issue No. 4–5.] The fact that Apple was aware of the antitrust laws is not disputed nor does the import of that knowledge make a difference with respect to its liability in this case.

(B) That Apple entered a conspiracy whose object was to terminate mail order dealers selling at discount or to fix prices [Issues No. 6, 7, 8, 18, 20, 36, 37, 40, 41, 43, 48]. This is an issue as to which the only genuine factual predicates are complaints about discounting and mail order sales by Apple dealers, Apple's decision to prohibit all mail order sales, and termination of dealers who thereafter made mail order sales. However, there is no substantial controversy with respect to the fact that discounting existed before, after and apart from the mail order prohibition. Plaintiffs have raised no genuine issue as to the existence of facts from which an entertainable inference may be drawn of agreement to raise, fix or stabilize the price at which Apple computers would be sold at retail.

(C) That the purpose of Apple (and its alleged dealer co-conspirators) in implementing the mail order prohibition was to provide a pretext for terminating discounters. [Issue Nos. 12, 13, 15, 28, 29, 33, 36, 45.] Apple's subjective purpose is not material. Its conduct stopped mail order but not discounting. There are in any event no facts upon which a reasonable inference could be based that Apple believed or intended its mail order prohibition to have the effect of eliminating price competition, since non-mail order dealers discounted before and after the prohibition, and mail order dealers discounted their non-mail order sales before and after the prohibition at the same time they made mail order sales at or near suggested retail price.

(D) What were Apple's sales [Issue No. 10] and share of particular sub-markets [Issue Nos. 11, 19, 25, 42, 47, 49]. These are not material to per se liability; and to the extent relevant to Judge Marshall's finding of no effect on competition, can make no substantial difference given plaintiffs' agreement that competition was intense both before and after the mail order prohibition.

(E) Damage to plaintiffs' business [Issue Nos. 23, 27, 28, 39]. This is material only to the issues of standing and remedy, not to determination of Apple's liability. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *See also Chandler Supply Co. v. GAF Corp.*, 650 F.2d 983, 989 (9th Cir.1980).

(F) That neither plaintiffs nor any dealer selling mail order was among those appointed to the Dealer Advisory Council [Issue No. 30]. This does not create a genuine or material issue which must be resolved in view of the uncontroverted fact that no price discussions took place.

(G) Whether Apple was right or wrong in its position that customer support was needed [Issue No. 32, 35]. This is not a genuine issue because of plaintiffs' concession that Apple was sincere in its belief; and because of the undisputed fact that Apple held that belief before mail order sales, or complaints about them, were made. Likewise, the service actually provided by plaintiffs [Issue No. 34] is neither genuinely in dispute nor material in light of their admitting that in their operations no support for mail order was given but at the

same time face-to-face sales were fully supported.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. 15.

2. The Court has personal jurisdiction over the defendant for purpose of this action.

3. Venue is proper in this district.

 4. While "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles," *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1139 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974), the Court has a duty to grant summary judgment if there is no genuine issue of material fact and if, considering the admissible evidence in the light most favorable to the opposing parties, they fail to present a record sufficient to support a reasonable finding in their favor. *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1260 (9th Cir.1983); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1381 (9th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). Plaintiffs are entitled to have all inferences from the facts in the record viewed in the light most favorable to them and to have all doubts as to the existence of genuine issues of fact resolved in their favor. *Ron Tonkin.* However, neither speculation nor mere allegation of disputed facts suffices. *Ron Tonkin,* 637 F.2d at 1381. Absent significant probative facts, summary judgment is appropriate in restricted distribution cases. *See e.g., General Business Systems v. North American Philips Corp.,* 699 F.2d 965 (7th Cir.1983); *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.,* 698 F.2d 1011 (9th Cir.1983); *Continental T.V. Inc. v. G.T.E. Sylvania, Inc.,* 694 F.2d 1132 (9th Cir.1982) ("*Sylvania* II); *A.H. Cox & Co. v. Star Machinery*

*Co.,* 653 F.2d 1302 (9th Cir.1981); *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190 (6th Cir.1982).

 5. Section 1 of the Sherman Act prohibits concerted activity "in restraint of trade." Independent action is not proscribed. *United States v. Colegate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed.2d 992 (1919). Only those restraints which are "unreasonably restrictive of competitive conditions" are condemned. *Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978). Such activity is analyzed under either the "rule of reason" or the "per se" rule. The rule of reason "requires the fact finder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.,* 710 F.2d 1366, 1370 (9th Cir.1983) (quoting *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982)). The per se rule, on the other hand, is applied to an activity or practice only when "experience with [the] particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Cascade Cabinet* at 1370 (quoting *Maricopa County,* 102 S.Ct. at 2473); *Northern Pac. R.R. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *see Broadcast Music, Inc. v. CBS, Inc.,* 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). Vertical non-price restraints are subject to a rule of reason analysis. *Sylvania; see also Cowley v. Braden Industries, Inc.,* 613 F.2d 751 (9th Cir.), *cert. denied,* 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980); *First Beverages, Inc. v. Royal Crown Cola Co.,* 612 F.2d 1164 (9th Cir.), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Clairol, Inc. v. Boston Discount Center, Inc.,* 608 F.2d 1114 (6th Cir.1979); *Tripper Corp. v. Chrysler Corp.,* 484 F.Supp. 507 (N.D.Cal.1980).

6. Judge Marshall found that "plaintiffs do not offer significantly probative evidence that Apple's mail order prohibition adversely affects competition." Thus an essential predicate for liability under the rule of reason is absent.[8] *See e.g.,*

8. It is clear that Judge Marshall's conclusion is correct and substantially supported in the record. Plaintiffs have neither pleaded, *see e.g., Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549 (7th Cir.1980); *Whims Appliance Service, Inc. v. General Motors Corp.,* 1978–1 Trade Cases (CCH) ¶ 62,093 (N.D.Ohio 1978), nor proved, anti-competitive effect, and therefore cannot establish a rule of reason violation even if they were able to show that Apple had an anti-competitive purpose. *See Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190 (6th Cir.1982); *Borger v. Yamaha International Corp.,* 625 F.2d 390 (2d Cir.1980); *H & B Equipment Co., Inc. v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978); *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Regardless, on the record adduced it is evident that Apple's mail order prohibition was a reasonable restraint. A vertical non-price restraint, by definition, limits in some manner the ability of a manufacturer's dealers to compete with each other (*i.e.,* intraband competition). But a diminution of intraband competition is not in and of itself determinative of the restraint's overall effect on competition, and hence its legality. As the Supreme Court noted in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), vertical non-price restraints have the "potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." *Sylvania,* 433 U.S. at 51, 97 S.Ct. at 2558. Such vertical restraints promote interbrand competition by allowing the manufacturer "to achieve certain efficiencies in the distribution of its product," such as the provision of pre- and post-sale support and the elimination of "free riders." *Id.* at 54–55, 97 S.Ct. at 2559–60.

Even if there is a negative effect on intrabrand competition, if that effect is weighed against the benefits to interbrand competition produced by the restraint, and overall the level of competition in the industry is enhanced, the restriction is permissible under the rule of reason. *See e.g., Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292 (5th Cir.1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981); *Cowley v. Braden Industries, Inc.,* 613 F.2d 751 (9th Cir.), *cert. denied,* 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980). Unless plaintiffs demonstrate the anti-competitive effect of the challenged restraint, this is the case regardless of whether pro-competitive results are asserted in support of the restraint. *Gough v. Rossmoor Corp.,* 585 F.2d at 388–89.

Only if a manufacturer so dominates a market as to exert substantial monopoly or market power—"the power to raise prices significantly above the competitive level without losing all of one's business"—is there any danger of harm to competition from an intrabrand vertical restriction. *Graphic Products Distributors, Inc. v. Itek Corp.,* 1983–2 Trade Cases (CCH) ¶ 65,670 at 69,299–124 (11th Cir.1983); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir.1982); *see Mendelovitz v. Adolph Coors Co.,* 693 F.2d 570 (5th Cir.1982). Absent significant market power, a vertical restriction is reasonable as a matter of law. *Davis-Watkins Co.,* 686 F.2d at 1202; *Bruce Drug, Inc. v. Hollister, Inc.,* 1982–2 Trade Cases ¶ 64,941 at 72,796 (1st Cir.1982); *Muenster Butane,* 651 F.2d at 298. Market power may be measured by market share, *see e.g., Graphic Products,* or other indicia of interbrand competition such as the number of competitors in the market, *Red Diamond Supply; Muenster Butane; Beltone Electronics Corp.,* [FTC Complaints and Orders] Trade Reg. Reports ¶ 21,934 (1982); the number of new entrants in the industry, *Kestenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564 (5th Cir.1978); *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750 (D.Md.1980), *aff'd,* 638 F.2d 15 (4th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *Beltone;* and whether the manufacturer's market share has declined, *Beltone; Rice Tire.*

There appears no substantial dispute as to the appropriate product [all general purpose minicomputers and microprocessors ranging in price from $300 to $20,000, *In re Data General Corporation Antitrust Litigation,* 529 F.Supp. 801 (N.D.Cal.1981) ] or geographic [nationwide] markets. Although there is some dispute about whether Apple's market share was 6% or approached 20%, the actual percentage is not material since there is no dispute that competition (and the number of competitors) was intense before, and increased after, the mail order prohibition was adopted. *See, e.g., Red Diamond Supply; Muenster Butane; Beltone Electronics Corp.*

Further, even if Apple had sufficient market power, plaintiffs would still be required to demonstrate that the mail order prohibition actually produced an adverse effect on the level of competition in the industry, *see e.g., Cowley v. Braden Industries,* but have not done so. Apple has a greater number of authorized dealers subsequent to the mail order prohibition than prior to it; and prices charged by Apple dealers decreased, and the level of competition among Apple dealers increased, subsequent to the mail order prohibition. The record indicates that competition in the industry, both among Apple dealers and among small computer manufacturers, has increased since the restriction was promulgated. Under such circumstances, summa-

*Calculators Hawaii, Inc. v. Brandt, Inc.,* 1983–2 Trade Cases (CCH) ¶ 65,697 (9th Cir.1983); *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429 (9th Cir.1979); *Gough v. Rossmoor Corp.,* 585 F.2d 381 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *Robert's Waikiki U-Drive v. Budget Rent-A-Car,* 491 F.Supp. 1199 (D. Hawaii 1980). Logically it should follow that a practice lawful under the rule of reason is not per se illegal. *See Cascade.* Nevertheless, plaintiffs rely on a per se theory, and it is that part of the prior order which must be reconsidered in light of intervening authority that bears on whether a per se price-fixing scheme is made out by virtue of Apple's prohibiting mail order distribution in the context of competitors' complaints about pricing and free-riding.

■■■ 7. Plaintiffs urge that conspiracy may be inferred solely from dealer complaints to Apple about mail order outlets, the fact that Apple considered other steps to restrict distribution, and Apple's subsequent modification of its Dealer Sales Agreement to prohibit mail order sales. However, none of these circumstances permits the inference which plaintiffs request and the law requires. *Filco; Roesch, Inc.;*

ry judgment is appropriate. *See Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111 (5th Cir. 1979); *H & B Equipment Co., Inc. v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978); *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Graphic Products,* 1983–2 Trade Cases ¶ 65,670 at 69,299–126; *Valley Liquors,* 678 F.2d at 745; *Bruce Drug,* Trade Reg.Reports ¶ 21,934 at 72,796; *Muenster Butane,* 651 F.2d at 295; *Golden Gate Acceptance Corp. v. General Motors Corp.,* 597 F.2d 676 (9th Cir.1979).

Absent a price-fixing context, a manufacturer such as Apple is free to impose non-price restraints, *Schwinn;* and to terminate a dealer who does not conform, whether or not that dealer also discounts and whether or not competing dealers have complained, so long as there is no pernicious economic effect on competition. *Cf. GTE Sylvania,* 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18; *Filco,* 709 F.2d at 1265 n. 2; *see also Cascade Cabinet Co. v. Western Cabinet & Millwork,* 710 F.2d 1366, 1371 (9th Cir.1983); *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302 (9th Cir.1981); *Ron Tonkin Gran Turismo,*

*Battle; Russell Stover Candies; Monsanto.*

■■■ Plaintiffs first contend that their case can be characterized as a horizontal conspiracy among independent computer dealers, relying upon *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In *General Motors,* the Supreme Court applied the *per se* rule when a local group of automobile dealers induced General Motors to prohibit its dealers from selling to discounters who competed with the group. Because General Motors first imposed and later enforced a contractual restriction, the dealers' horizontal conspiracy to exclude discounters from the marketplace was more effective than it would have been without the manufacturer's participation. *Id.* at 144, 86 S.Ct. at 1330. In order to satisfy the *General Motors* test of per se illegality, plaintiffs would have to, but do not, show (1) a pre-existing dealer conspiracy, (2) which Apple joined and used to enforce its mail order prohibition or a price-fixing scheme of which a component was its mail order prohibition. There is no evidence, circumstantial or otherwise, reasonably to support a finding of either element. *See Continental T.V. v. GTE Sylvania,*

*Inc. v. Fiat Distributors,* 637 F.2d 1376 (9th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). Plaintiffs concede and Judge Marshall found that there is none in this case.

Finally, since the mail order prohibition directly restricts only the class of customers to whom dealers may sell Apple products, it falls precisely within that class of vertical restrictions which has been subjected to, and has withstood, rule of reason analysis. *GTE Sylvania,* 433 U.S. at 55, 97 S.Ct. at 2560; *Sylvania II,* 694 F.2d 1132 (9th Cir.1982); *see also Cowley v. Braden Industries, Inc.,* 613 F.2d 751 (9th Cir.), *cert. denied,* 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980); *First Beverages, Inc. v. Royal Crown Cola Co.,* 612 F.2d 1164 (9th Cir.), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Clairol, Inc. v. Boston Discount Center, Inc.,* 608 F.2d 1114 (6th Cir.1979). That it eliminates free riders makes no difference. *GTE Sylvania,* 433 U.S. at 55, 97 S.Ct. at 2560; *Donald B. Rice Tire Co., Muenster Butane; cf. Filco,* 709 F.2d at 1265, n. 2 (declining to condone effort to do away with free riding if in a price-fixing context).

433 U.S. 36, 58, n. 28, 97 S.Ct. 2549, 2561, n. 28, 53 L.Ed.2d 568 (1977); *A.H. Cox & Co. v. Star Mach. Co.*, 653 F.2d 1302 (9th Cir.1981); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). It is undisputed that Apple investigated, implemented and monitored compliance with the mail order prohibition unilaterally, without dealer participation of any kind. *Cf. Chisholm,* 498 F.2d at 1142. Plaintiffs cite no substantial evidence of horizontal dealer conspiracy other than the fact that dealers complained to Apple, at meetings and otherwise, about a variety of subjects including mail order. However, "the common practice of complaining," even about a discounting competitor, "is insufficient to establish an inference of horizontal conspiracy." [9]

■ 8. In *Filco* the Ninth Circuit directly addressed the issue of what evidence a plaintiff needs to adduce in order to overcome a supplier's motion for summary judgment in a case involving termination of a discounter by a supplier following the receipt of complaints by the discounter's competitors. In *Filco,* the plaintiff retailer/distributor alleged that Amana had conspired with two of its dealers to fix prices in violation of § 1 of the Sherman Act. The plaintiff claimed that its termination was the result of competing dealers complaining about plaintiff's discount prices. *Id.* at 1260. The plaintiff in *Filco* testified that he was told by Amana's salesman that Amana products "should not be discounted;" that he had to maintain the price; and

that if he did not stop discounting he would be terminated. Affirming summary judgment for the manufacturer, *Filco* provides that the court first determine whether there is sufficient evidence to establish a combination or conspiracy. *Id.* at 1261. Competitor complaints plus termination is not sufficient. *Id.* at 1263; *see also Battle v. Lubrizol,* 712 F.2d 1238, 1239 (8th Cir. 1983) (en banc, equally divided); *Roesch, Inc. v. Star Cooler Corp.,* 712 F.2d 1235, 1237 (8th Cir.1983) (en banc, equally divided). Accordingly, the court must then determine whether the plaintiffs have shown something in addition which does suffice. If so, and if the concerted action is to set prices, the per se rule is implicated; if to restrict non-price practices only, the conduct is judged under the rule of reason. *Continental T.V., Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *see Zidell Explorations, Inc. v. Conval International, Ltd.,* 1983–2 Trade Cases ¶ 65,706 (9th Cir.1983). Plaintiffs here have failed to show the "something more" which is required to get to the jury.

■ Plaintiff's evidence does not show affirmative action by Apple to induce compliance with its pricing preferences through threats or demands. There is no evidence in the record which would reasonably support a finding that any dealer communicated concurrence in Apple's pricing policy at Apple's insistence. All of the substantial evidence is to the contrary. Nothing is comparable to the explicit statements attributed to Amana salesmen in *Filco.* There, as here, defendant's conduct did not

---

**9.** Even if plaintiffs were able to proffer sufficient evidence of concerted activity, the conspiracy they would thereby establish warrants application of the rule of reason, not the per se rule. Once it is conceded that the mail order prohibition neither addressed price nor inhibited dealer pricing discretion—so that it does not fit "easily" into the vertical price-fixing category— and absent evidence of a horizontal dealer conspiracy, the fact that the mail order prohibition may have been solicited by dealer complaints does not transform its character from a vertical non-price restriction into a per se illegal action. "Restraints solicited by a distributor but implemented by a manufacturer" are per se violations only if they "clearly had, or [were] likely to

have a pernicious effect on competition." *Cascade Cabinet,* 710 F.2d at 1371; *General Business Systems,* 699 F.2d at 978; *A.H. Cox,* 653 F.2d at 1306; *Ron Tonkin Gran Turismo,* 637 F.2d at 1386–87. Since plaintiffs are unable to demonstrate that the mail order prohibition adversely affected competition in this case and Judge Marshall so concluded, there is no basis for finding that a mail order prohibition would "always or almost always tend to restrict competition." Accordingly, application of the per se rule would not be appropriate, even if plaintiffs could proffer sufficient evidence of concert of action to warrant Section 1 consideration. *Cascade Cabinet* at 1372.

impinge on plaintiffs' freedom to set prices and therefore is insufficient to constitute coercion or to create an inference of conspiracy. *Filco; see also Chisholm Brothers Farm Equipment Co. v. International Harvester,* 498 F.2d at 1142. Furthermore, the record, when viewed in its entirety, belies any credible claim of coercion. When plaintiffs were asked in deposition how they set their prices for Apple products, each testified that prices were set in response to competitive pressures—what the market would bear, what their competitors were charging, etc. Not one claimed that he had set his prices based on anything Apple had said. Plaintiffs admitted that after the mail order prohibition, as before, they were free to sell to any customer, in any territory, at any price, so long as the sale was fully supported in a face-to-face manner. The testimony of independent sales representatives, on which plaintiffs place principal reliance, also demonstrates the absence of coercion. According to these representatives, Apple did nothing about "discounting" by its dealers. No dealer was ever told the price for which he was to sell Apple products; no dealer was ever threatened with termination for discounting; and no dealer was ever terminated because of discounting.

■ 9. Nor may plaintiffs overcome summary judgment simply because Apple enforced the mail order prohibition by offering written contracts under which dealers were to provide face-to-face support as a condition of doing business with Apple. If plaintiffs could prevail merely by showing adherence to the manufacturer's contracts under threat of termination, all vertical non-price distribution restraints would be illegal per se. That is not the law. *Continental T.V., Inc., v. GTE Sylvania, Inc.,* 461 F.Supp. 1046, 1048 (N.D.Cal.1978), *on remand from* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), *aff'd,* 694 F.2d 1132 (9th Cir.1982).

■ 10. Other factors may bear on whether the manufacturer acted independently of its dealers, including the volume and intensity of complaints, the relationship in time between the complaints and the action, and whether the manufacturer had valid, independent reasons for acting as it did. *Filco,* 709 F.2d at 1264. In *Filco,* the plaintiff adduced evidence that complaints about its discount pricing were "voluminous and virulent" (*id.* at 1265), and that the manufacturer was displeased with plaintiff's pricing practices prior to terminating the plaintiff (*id.*). Nevertheless, the court ruled that plaintiff failed to show sufficient evidence of a causal nexus between the complaints and the termination to support a reasonable inference of conspiracy (*id.* at 1266); dealer complaints were "the type typically made" (*id.* at 1265); a long time gap separated the first receipt of complaints and the manufacturer's action (709 F.2d at 1265); the manufacturer took at least one order from plaintiff after the complaints (*id.*); and the competing dealers who complained sold at price levels below the manufacturer's suggested retail price, albeit at a somewhat higher level than the plaintiff's prices (*id.* at 1266). Similarly in this case, it is neither surprising nor legally sufficient for purposes of inferring a conspiracy that dealers were conscious of, and complained about, discounting and free-riding. They did so in greater volume than in *Filco,* although not necessarily greater in proportion to the size of Apple's dealer network; Apple was certainly aware of the complaints; and there is no question that Apple was itself concerned about one of the consequences, declining support for its product in face-to-face contact. But its concern preceded dealer complaints; and there is no substantial evidence of any connection between the dealers' complaints, Apple's mail order prohibition and pricing.[10] Non-mail order deal-

---

**10.** Specifically:

(1) Apple's concern was face-to-face support and opposition to mail order sales began at the inception of the company and antedated complaints about price erosion.

(2) Apple adhered to a consistent policy of full-support as evidenced by numerous programs.

(3) Prior to the mail order prohibition, there were full-support, non-mail order dealers that

ers discounted before, and discounting continued without inhibition after, the mail order prohibition.

Moreover, there is no evidence from which it might reasonably be inferred that Apple would not have imposed the mail order prohibition but for the influence of its dealers. *See Muenster Butane, Inc.; Red Diamond Supply, Inc.* That Apple and its dealers communicated on mail order, prices, and a variety of other subjects does not in and of itself show that either the mail order prohibition, or pricing decisions by Apple or its dealers, were not independently arrived at or were related. *See Monsanto,* 104 S.Ct. at 1470. Nor does the fact that upward pressure on resale price *may* be a collateral consequence of a vertical restraint suffice to raise an inference of unlawful price-fixing. *See JBL Enterprises; Butera v. Sun Oil Co.,* 496 F.2d 434, 437–38 (1st Cir.1974). So long as the restraint impels dealers to provide desired services with price competition, rather than to adhere to a uniform price without competition, an incidental price effect is immaterial. *See General Cinema Corp. v. Buena Vista Distribution Co.,* 681 F.2d 594, 597 (9th Cir.1982).

Under these circumstances it would neither be reasonable to infer a price-fixing conspiracy, nor rational to infer that Apple acted other than in furtherance of its own economic interests. *Monsanto,* 104 S.Ct. at 1471. To do so in this case would virtually immunize a dealer from legitimate, vertically imposed requirements by a manufacturer once a competitor has complained. *Cf. GTE Sylvania.*

10. Even if the evidence were sufficient to support an inference of concerted action between Apple and its dealers, there is none to link the action taken on mail order sales to price-fixing. Because there is no genuine issue as to the lack of any demonstrable adverse effect on competition [Order, p. 3], even concerted action with respect to mail order sales, analyzed under the rule of reason, would not constitute a violation of the antitrust laws. *See Monsanto,* 104 S.Ct. at 1469; *GTE Sylvania, Inc.*

11. Apple's subjective intent in promulgating the mail order restraint is not material for purposes of this summary judgment. Whether Apple liked or disliked discounting as a pricing policy is not probative, nor is whether it wished to do business with plaintiffs. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Filco,* 709 F.2d at 1265; *Cascade Cabinet,* 710 F.2d at 1372; *see also Valley Liquors, Inc. v. Importers, Ltd.,* 678 F.2d 742 (7th Cir.1982). Plaintiffs concede that a manufacturer has a legitimate interest in pre- and post-sales support, and plaintiffs' witnesses acknowledge that Apple believed in its full-support philosophy. Whether plaintiffs believe or disbelieve that Apple implemented the mail order prohibition for a valid business reason is likewise not probative; their testimony concedes that support was Apple's articulated concern and reason for the change

---

sold Apple products at discount and dealers who sold Apple products via mail order at the full suggested retail price.

(4) In determining whether to adopt a mail order prohibition, the company undertook an exhaustive investigation to determine whether such a policy was in its own best interest.

(5) The mail order prohibition did not address price at all; rather, pricing discretion has always remained with the dealer.

(6) After implementation of the mail order prohibition, Apple continued to sell to any dealer who signed the prohibition, regardless of the price he charged.

(7) Under Apple's cooperative advertising program dealers were compensated for advertising Apple products regardless of the price at which they advertised.

(8) The dealers who were terminated for violating the mail order prohibition sold at various price levels, including the full suggested retail price.

(9) Discounting, price erosion, and complaints about discounting have continued even after the mail order prohibition.

(10) Apple has become a more effective competitor in the small computer market.

(11) The overall level of competition in the small computer industry increased after the mail order prohibition and prices to consumers for small computer products continued to decline after Apple promulgated the prohibition.

in policy and they offer no non-speculative evidence to the contrary.

In any event plaintiffs only evidence of intent consists of the fact that Apple considered, but did not adopt, a "support rebate allowance" program, a consignment system and a modification of its cooperative advertising policy, none of which would have been unlawful, *see Mesirow v. Pepperidge Farms, Inc.,* 703 F.2d 339 (9th Cir.1983); *In re Nissan Antitrust Litigation,* 577 F.2d 910 (5th Cir.1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979); and the assertion that Apple terminated its Los Angeles sales representative for failure to control dealer prices. There is no admissible evidence to support this contention; on the contrary, the record indicates that the sales representative was, by his own admission, incapable of correcting his business performance deficiencies. DiLillo Tr., p. 208, line 22—p. 209, line 11. Finally, plaintiffs cite the speculation of one of Apple's terminated sales managers as to the company's intent, but that witness himself admitted that he had no support of any kind for his "personal opinion." DiLillo Tr., p. 129, line 25—p. 130, line 22.

12. Apple's subjective intent would not in any event determine whether its action is illegal per se. *Cascade Cabinet,* 710 F.2d at 1372. To act with anticompetitive purpose simply means that the defendant intentionally engaged in conduct which always, or almost always, adversely affects competition, *i.e.,* is per se illegal. *Ibid.* The pertinent inquiry is whether the defendant deliberately undertook a course of conduct which has a recognized anticompetitive effect. If so, the conduct is itself per se illegal because of the characteristics of the intended action. But if the underlying action is not per se illegal because it does not always adversely affect competi-

tion, the fact that the manufacturer or supplier was subjectively motivated to harm plaintiffs or their way of doing business does not transform rule of reason activity into conduct which is illegal per se. *Cascade* therefore indicates that there is no reason to refrain from granting summary judgment because of an argument that defendant's conduct could be infected by anticompetitive purpose or intent which should be resolved by the jury. To avoid summary judgment, there must be significant probative evidence which is relevant to disputed factual issues that are truly material to the litigation. *General Business Systems v. North American Philips Corp.,* 699 F.2d 965, 971 (9th Cir.1983). In *GTE Sylvania,* the Supreme Court left open the possibility that per se standards might apply to non-price vertical restraints where plaintiff could show "pernicious economic effect or lack of any redeeming virtue." 433 U.S. at 58. There is no basis in this record for assuming or inferring that a mail order prohibition of the sort adopted by Apple "always adversely affects competition." [11] Accordingly, plaintiffs may not bootstrap themselves into a per se analysis by arguing Apple's subjective intent.

13. Plaintiffs have cited the Ninth Circuit decision in *Zidell Explorations, Inc. v. Conval International, Ltd.,* 1983–2 Trade Cases (CCH) ¶ 65,706, in support of the propositions that Apple's intent is relevant to a determination of the legality of the mail order prohibition, and that the per se rule should be applied to this case. However *Zidell* does not require that summary judgment be denied.

First, *Zidell* was a case in which the court charged the jury on a per se theory, applying the rule that "if a manufacturer deliberately withdraws its product from a price-cutting distributor at the request of a competing dealer *as part of a conspiracy*

---

**11.** There is nothing in this record to suggest that the mail order prohibition is anything other than a vertical non-price restraint in terms of its design, implementation, and effect. Furthermore, the complaint in this case does not address the termination of discounters at all. Rather, plaintiffs seek an injunction to prohibit implementation of a vertical non-price restraint. Accordingly, this case is controlled by *Cascade, General Business Systems* and *Ron Tonkin* —even if the mail order prohibition were solicited by dealer complaints, it would still be evaluated under the rule of reason, Apple's subjective intent notwithstanding.

to protect the requesting distributor from price competition, the manufacturer has committed a per se violation of the antitrust laws." *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979) [emphasis added]. *Zidell* does not alter the requirement that a plaintiff first establish a conspiracy, nor does it address the showing required in the context of a summary judgment motion, which *Filco* does.

Second, the *Zidell* court discussed intent only *after* it was satisfied that a price-fixing conspiracy existed *and* in the context of the degree to which an anticompetitive motive must be shown to warrant applying a per se rule to a dealer termination which might be part of such a conspiracy, or might be pursuant to a lawful purpose. Compare *Cernuto* with, *e.g.*, *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir.1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). In so doing it does not recast the objective standard for what constitutes a per se violation.

 Third, the conspiracy in the *Zidell* case was essentially a *horizontal* conspiracy to allocate markets in which the pressure on the supplier leading to plaintiff's termination was pressure from a *competing supplier*, not pressure from the terminating supplier's own dealer.[12]

### Conclusion

 It is inappropriate to infer concerted action or a price-fixing agreement from "highly ambiguous evidence." *Monsanto*, 104 S.Ct. at 1470. The Court therefore grants defendant's motion for summary judgment on the ground that plaintiffs have not presented a record sufficient to support a reasonable finding in their favor. *See Filco; General Business Systems; JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011 (9th Cir.1983); *Continental T.V. Inc. v. GTE Sylvania,*

*Inc.*, 694 F.2d 1132 (9th Cir.1982); *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137 (9th Cir.1974).

IT IS SO ORDERED.

---

12. Plaintiffs must meet a stricter standard to establish a vertical as opposed to a horizontal conspiracy. *Filco*, 709 F.2d at 1266. Even if the *Zidell* standard were applied to this case, plaintiffs could prevail only if they show that Apple's business motivation to promote pre- and post-sales support "pale[s] in significance by comparison to the illegal motive." *Zidell*, 1983–2 Trade Cases at ¶ 69,610. On this record, plaintiffs have not done so.